**STATE of Minnesota, Respondent,**

v.

**Michael Wayne HENDRICKSON,
Appellant.**

No. C9–98–47.

Court of Appeals of Minnesota.

Aug. 31, 1998.

Hubert H. Humphrey III, Attorney General, St. Paul, and Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, for respondent.

John M. Stuart, State Public Defender, Theodora Gaitas, Assistant Public Defender, Minneapolis, for appellant.

Considered and decided by SHUMAKER, P.J., PETERSON and AMUNDSON, JJ.

## OPINION

PETERSON, Judge.

In this appeal from a judgment of conviction for theft in violation of Minn.Stat. § 609.52, subd. 2(1) (1996), appellant argues that the district court erred when it denied his motion to suppress statements he made to police officers and evidence recovered as a result of those statements. We conclude that some of the statements appellant made to police officers should have been suppressed. But because we also conclude that the remaining admissible evidence sustains the judgment of conviction, we affirm.

## FACTS

At approximately 6:30 p.m., William King reported to the Blaine Police Department that a Colt .45–caliber handgun had been stolen from his house. King told the officer who was dispatched to investigate the report that he had left the loaded handgun on an end table in the living room. King's daughter, Stephanie, told the officer that appellant Michael Wayne Hendrickson had been at the house earlier in the day and had left around noon. Sometime after he left, she noticed that the gun was missing. Stephanie told the officer that she had phoned Hendrickson, and he admitted that he took the gun.

The district court found that upon receiving this information, the investigating officer's main concern was removing the loaded handgun from the "street." Because of this concern, the officer devised a plan for Stephanie to arrange to meet Hendrickson at 8:00 p.m. at a nearby apartment building. When Hendrickson arrived at the apartment building, the investigating officer and a back-up officer were waiting for him. The officers pushed Hendrickson to the floor, handcuffed him, and told him that he was under arrest. The district court found that before the officers asked Hendrickson anything, he spontaneously stated words to the effect of, "I know what you're looking for. I don't have it." A pat search revealed that Hendrickson was not carrying the handgun.

Without first giving Hendrickson a *Miranda* warning, the officers questioned him about the location of the gun. They told him that they knew he was involved in stealing a handgun from the King home and it would be in his best interest to aid them in getting the loaded handgun off the street. Hendrickson told the officers that he took the gun and that he had given it to his friend Dan Dzuris to hold until Hendrickson had an opportunity to sell it. Hendrickson also said that he believed the gun was in a car at the Dzuris residence.

The officers took Hendrickson to the Dzuris residence. With the consent of Dzuris's mother, the officers searched a car, but failed to find the gun. The officers then learned from a third officer who was guarding Hendrickson that Hendrickson wanted to speak to them again. One of the officers returned to the squad car where Hendrickson was being held and Hendrickson told him that the gun was probably inside Dzuris's house. With the consent of Dzuris's mother, the officers searched Dzuris's bedroom and found a Colt .45–caliber handgun.

Hendrickson was taken to the police station, where he was read a *Miranda* warning. After waiving his *Miranda* rights, Hendrickson provided a ten-minute recorded statement in which he admitted taking the handgun and giving it to Dzuris to hold until it could be sold. Hendrickson also said that he and Dzuris planned to keep the gun in Dzuris's mother's car.

Two days later, police questioned Dzuris at the police station. Dzuris stated that Hendrickson had admitted stealing the handgun from the King home. Dzuris admitted that he agreed to keep the gun until Hendrickson could sell it and that he hid the gun in his bedroom.

Hendrickson was charged with one count of theft in violation of Minn.Stat. § 609.52, subd. 2(1) (1996). Before trial, Hendrickson moved to suppress the statements he made to police before receiving a *Miranda* warning and any evidence obtained as a result of these statements. The district court denied the motion, ruling that Hendrickson's first two statements to police ("I know what you're looking for. I don't have it.") were spontaneous statements and not the product of police interrogation. The court found that the other statements Hendrickson made to the officers before he was given a *Miranda* warning were the result of police interrogation, but fell within the "public safety" exception to the requirements of *Miranda*. The court also found that the gun and the statements Hendrickson made after receiving a *Miranda* warning were not the "fruit of a poisonous tree."

Hendrickson waived his right to a jury trial, and the case was submitted to the trial court on stipulated facts pursuant to *State v. Lothenbach*, 296 N.W.2d 854, 857 (Minn. 1980), to preserve the omnibus issues for appellate review. The district court found Hendrickson guilty.

## ISSUES

1. Were the statements that Hendrickson made before receiving a *Miranda* warning admissible under the public safety exception to the *Miranda* requirements?

2. Were the statement that Hendrickson gave to the police after receiving a *Miranda* warning, the gun, and the statement that Dzuris gave to the police inadmissible because they were obtained as a direct result of the statements Hendrickson made before receiving a *Miranda* warning?

## ANALYSIS

Hendrickson argues that because he was in custody when the officers initially questioned him about the location of the gun and he did not receive a *Miranda* warning before being questioned, the district court erred by denying his motion to suppress the statements he made before receiving a *Miranda* warning.[1] *See State v. Provost*, 490 N.W.2d 93, 96 (Minn.1992) (statements made during custodial interrogation inadmissible "unless the suspect is given the *Miranda* warning and intelligently waives the right against self-incrimination") (citing *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966)). He also argues that the district court erred by denying his motion to suppress the gun, the statements he made after receiving a *Miranda* warning, and Dzuris's statement to the police because that evidence was obtained as a result of the statements Hendrickson made before receiving a *Miranda* warning.

[W]hen reviewing a pre-trial order suppressing evidence where the facts are not in dispute and the [district] court's decision is a question of law, the reviewing court may independently review the facts and determine, as a matter of law, whether the evidence need be suppressed.

*State v. Othoudt*, 482 N.W.2d 218, 221 (Minn. 1992).

## 1. Initial Statements

■ It is undisputed that Hendrickson was in police custody when he initially made statements about the location of the handgun in response to police questioning and that the officers questioned Hendrickson without first giving him a *Miranda* warning. The district court concluded, however, that the statements should not be suppressed because they

1. Hendrickson does not challenge the district court's conclusion that his first two statements,

("I know what you're looking for. I don't have it.") were not the product of police interrogation.

are within the "public safety" exception to *Miranda* set forth in *New York v. Quarles,* 467 U.S. 649, 655–57, 104 S.Ct. 2626, 2631–32, 81 L.Ed.2d 550 (1984). Hendrickson argues that these statements are not within the public safety exception. We agree.

In *Quarles,* two police officers on patrol were stopped by a young woman who told them she had just been raped. *Id.* at 651–52, 104 S.Ct. at 2629. The woman described her assailant and told the officers that he had just entered a nearby supermarket and that he was carrying a gun. *Id.* at 651–52, 104 S.Ct. at 2629. One of the officers entered the supermarket and quickly spotted a man who matched the description given by the woman. *Id.* at 652, 104 S.Ct. at 2629. Upon seeing the officer, the man turned and ran toward the rear of the store. *Id.* The officer pursued him. *Id.* When the man turned the corner at the end of an aisle, the officer lost sight of him for several seconds. *Id.* Upon seeing the man again, the officer ordered him to stop and put his hands over his head. *Id.* The officer frisked the man and discovered that he was wearing a shoulder holster, which was empty. *Id.* After handcuffing the man, the officer asked him where the gun was. *Id.* The man nodded in the direction of some cartons and said, "the gun is over there." *Id.* The officer recovered a loaded .38–caliber revolver from one of the cartons, formally arrested the man, and read him his *Miranda* rights. *Id.*

In a subsequent prosecution for criminal possession of a weapon, the trial court excluded the gun and the statement, "the gun is over there," because the officer had not given the man a *Miranda* warning before asking him where the gun was. The Supreme Court reversed and held

> that on these facts there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved.

*Id.* at 655–56, 104 S.Ct. at 2631.

> The Supreme Court explained that it did not believe that the *doctrinal underpinnings* of *Miranda* require that it be applied in all its rigor to a situation in which

police officers ask questions reasonably prompted by a concern for the public safety.

*Id.* at 656, 104 S.Ct. at 2631–32.

██ The state argues that the questions the officers asked before giving Hendrickson a *Miranda* warning are within the public safety exception recognized in *Quarles* because the officers' main concern was getting the loaded handgun off the street. We disagree. The concern for the public safety that the Supreme Court spoke of in *Quarles* was not a concern about the inherent danger posed by any loaded handgun somewhere in the community; it was a concern about the danger posed by a gun discarded in a public place where an unknown passerby could discover it. As the Supreme Court stated, the police in *Quarles*

> were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

*Id.* at 657, 104 S.Ct. at 2632.

In *Quarles,* the crime victim told police that her assailant had just entered a supermarket and was carrying a gun. The police drove to the store and found the suspect inside. During a brief chase, the police lost sight of the suspect for only several seconds. When the suspect was apprehended and his shoulder holster was found empty, the police had reason to believe that he had discarded his gun in the supermarket.

In contrast, the police apprehended Hendrickson approximately eight hours after he left the King home with the loaded gun. Eight hours was ample time for Hendrickson to deliberately put the gun somewhere or give it to someone. Consequently, the fact that Hendrickson was not carrying the gun when he was apprehended did not give the police reason to believe that the gun had been discarded in a public place where it

posed an immediate public danger. The officer who first questioned Hendrickson had no reason to believe that the gun had been quickly discarded in a public place.

Although the officers' concern about getting the handgun off the street was a concern about public safety, the officers were not confronted with the immediate necessity that confronted the officer in *Quarles*. The Supreme Court characterized the public safety exception it recognized in *Quarles* as a "narrow exception" to the *Miranda* rule. *Id.* at 658, 104 S.Ct. at 2632. The court emphasized in its holding that the exception applied "on these facts." *Id.* at 655–56, 104 S.Ct. at 2631. We conclude that the police officers' questioning of Hendrickson about the location of the gun was not reasonably prompted by an immediate threat to public safety. Therefore, Hendrickson was entitled to a *Miranda* warning before being questioned about the location of the stolen gun.

### 2. Fruit of the Poisonous Tree

■ Hendrickson argues that the trial court erred in failing to suppress the gun, the statement he gave at the police station after receiving a *Miranda* warning, and the statement Dzuris gave the police because this evidence was obtained as a direct result of the illegally obtained initial statements and was inadmissible as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (when police act illegally, evidence obtained by exploitation of the illegality must be suppressed). We disagree.

Under *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the statement Hendrickson gave after receiving a *Miranda* warning need not be suppressed simply because Hendrickson did not receive a *Miranda* warning before making his initial statements to the police. In *Elstad,* the police did not give the defendant a *Miranda* warning before asking him what he knew about a burglary. *Id.* at 301, 105 S.Ct. at 1289. The defendant admitted that he had been present at the scene of the burglary. *Id.* Later, after receiving a *Miranda* warning, the defendant confessed to the burglary. *Id.* The defendant moved to suppress the later confession as "fruit of the poisonous

tree" under *Wong Sun* and its progeny. *Id.* at 302, 105 S.Ct. at 1289. The Court held:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293. The Court continued:

> Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statement.

*Id.* at 318, 105 S.Ct. at 1297–98 (footnote omitted).

Hendrickson argues that *Elstad* does not apply because the police officers' conduct at the arrest scene amounted to more than a "simple failure to administer warnings." Hendrickson contends that the circumstances at the arrest scene were coercive. Therefore, the traditional fruit of the poisonous tree analysis should apply, and the statement he gave at the police station was tainted by the failure to administer a *Miranda* warning at the arrest scene. We disagree.

■ A statement is not voluntary if "the defendant's will was overborne at the time he confessed." *State v. Jensen,* 349 N.W.2d 317, 319 (Minn.App.1984) (quoting *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963)). Factors to consider

when determining whether a statement was made voluntarily include:

age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, limits on access to counsel and friends, and others.

*State v. Linder*, 268 N.W.2d 734, 735 (Minn. 1978).

We conclude that both Hendrickson's initial statements to police and his later statement at the police station were voluntary. Hendrickson was age 23 when he was arrested and did not suffer from any physical or mental deficiencies that made it difficult for him to comprehend his situation. There is no evidence that Hendrickson's interrogation or detention at the arrest scene or at the police station was unreasonable or physically burdensome or that he requested and was denied access to counsel. Moreover, Hendrickson spontaneously stated, "I know what you're looking for. I don't have it," before he was asked any questions. Hendrickson was very cooperative when the police questioned him and repeatedly said that he understood their concern about getting the loaded handgun off the street. Because the circumstances surrounding the statements Hendrickson made to the police before receiving a *Miranda* warning were not coercive and the statements Hendrickson made before and after receiving a *Miranda* warning were made voluntarily, the later statement need not be suppressed as the fruit of the poisonous tree.[2]

■ We also conclude that Dzuris's statement need not be suppressed as the fruit of the poisonous tree because the statement was not obtained by exploiting the statements Hendrickson made before receiving a *Miranda* warning. Dzuris gave his statement to the police two days after Hendrickson gave his statement at the police station. In his statement at the station, Hendrickson told the police about Dzuris's role in regard to the gun. This statement, which was given after Hendrickson received a *Miranda* warn-

ing, provided a basis for the police to question Dzuris.

The state argues that, like Dzuris's statement, the gun was not obtained by exploiting the statements Hendrickson made at the arrest scene. The state contends that the gun would have been discovered after Hendrickson disclosed its location in the statement he made at the police station or certainly after Dzuris told the police what he did with the gun. The state acknowledges that the trial court did not determine whether the gun would have been inevitably discovered and contends that the proper remedy under *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), is to remand to allow the state to establish inevitable discovery by a preponderance of the evidence.

■ We will not decide whether a remand to permit the state to establish inevitable discovery is the proper remedy because we conclude that it is not necessary to determine whether the gun was inadmissible. Even if the gun was inadmissible and should not have been considered by the trial court, the evidence that was properly admitted is more than sufficient to sustain Hendrickson's conviction. *See generally State v. Aligah*, 434 N.W.2d 460 (Minn.1989)(holding court of appeals need not decide whether trial court erred if any error would be harmless beyond reasonable doubt). Stephanie King's testimony, the statement Hendrickson made after receiving a *Miranda* warning, and Dzuris's statement prove beyond a reasonable doubt that Hendrickson took the gun. We therefore affirm the judgment of conviction. *See State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997) (if verdict is "surely unattributable" to error, error is harmless beyond reasonable doubt and conviction stands).

## DECISION

The public safety exception to *Miranda* does not apply to the statements Hendrickson made before receiving a *Miranda* warning, and the statements were, therefore, inadmissible. However, because the failure to

---

2. Hendrickson also asserts that the statement he gave at the police station was procured in contravention of *State v. Scales*, 518 N.W.2d 587 (Minn.1994). This issue was not addressed by

any argument in Hendrickson's brief; therefore it is waived. *Melina v. Chaplin*, 327 N.W.2d 19, 20–21 (Minn.1982).

administer a *Miranda* warning was not accompanied by coercive circumstances and the statements Hendrickson made to the police before and after he received a *Miranda* warning were voluntary, the later statement was admissible. The statement that Dzuris gave to the police was not obtained by exploiting the inadmissible statements, and was, therefore, admissible. The admissible evidence is sufficient to sustain the judgment of conviction.

**Affirmed.**