Commonwealth *vs*. Christopher A. Greenberg.

No. 92-P-345.

Suffolk. January 14, 1993. - March 9, 1993.

Present: Smith, Fine, & Ireland, JJ.

*Delinquent Child. Jurisdiction*, Delinquent child, Transfer hearing. *Practice, Criminal*, Transfer hearing, Findings by judge, Voluntariness of confession, Disclosure of evidence, Preservation of evidence. *Evidence*, Expert opinion, Exculpatory. *Search and Seizure*, Consent. *Witness*, Expert. *Constitutional Law*, Admissions and confessions, Waiver of constitutional rights, Search and seizure. *Waiver. Homicide.*

At a transfer hearing pursuant to G. L. c. 119, § 61, to determine whether a juvenile defendant charged as a delinquent child by reason of having committed murder and arson should be tried as an adult, the judge was warranted in finding that, notwithstanding the opinion of an expert that the defendant was amenable to treatment as a juvenile but based upon other clear and convincing evidence in the record, the defendant presented a significant danger to the public and was not amenable to rehabilitation as a juvenile. [198-200]

At the hearing on a motion to suppress certain physical evidence belonging to the defendant in a murder case, the judge's finding that the defendant was not "in custody" at the time certain items were taken from him by police was not clearly erroneous where, at the time the defendant was questioned by police officers, the investigation had not as yet focused on the defendant, the defendant had his father with him for advice and support, the defendant and his father had traveled to and from the police station in their own vehicle, the atmosphere was informal and the questioning was not aggressive, and no charges were brought until several days later; moreover, the police conduct did not violate the defendant's rights under the Fourth Amendment to the United States Constitution, where the judge's finding that the defendant voluntarily handed over the items was warranted by the evidence; furthermore, police seizure of a knife from the defendant's person was proper as a reasonable self-protection measure. [200-202]

At a criminal trial, evidence of the defendant's guilt was sufficient to support his convictions of arson and second degree murder. [202-203]

A criminal defendant's due process rights were not violated by the failure of police to preserve certain allegedly exculpatory evidence seized in a search pursuant to a search warrant, where the defendant was not prejudiced by the missing evidence, the present of which at trial would have added nothing to benefit the defense. [203-204]

INDICTMENTS found and returned in the Superior Court Department on November 16, 1989, following a transfer hearing in the Chelsea Division of the District Court Department before *John C. Ligotti,* J.

A motion to suppress evidence was heard by *Robert W. Banks,* J., and the cases were tried before him.

*Mary F. Costello* for the defendant.

*Kenneth H. Anderson,* Assistant District Attorney, for the Commonwealth.

FINE, J. When fire fighters in Revere responded to a fire in a second-floor apartment, they found the victim in his bed, partially burned and with fatal stab wounds. The defendant, sixteen years old at the time of the incident, was charged with arson and the victim's murder. After transfer proceedings were conducted under G. L. c. 119, § 61, in the Chelsea District Court, the case went to trial before a jury in the Superior Court. The defendant was convicted of arson and second degree murder. On appeal, he challenges: (1) the decision to transfer him for trial as an adult; (2) the denial of his motion to suppress certain physical evidence; (3) the sufficiency of the evidence at trial to support the convictions; and (4) the fairness of the trial in light of the destruction by the Commonwealth of a piece of exculpatory evidence. We affirm the convictions.

1. *The transfer decision.* Before a juvenile may be transferred to the adult criminal justice system, G. L. c. 119, § 61, requires that a judge find, on clear and convincing evidence, after considering various enumerated factors, that the juvenile presents a significant danger to the public and is not amenable to rehabilitation.[1] The judge made subsidiary findings with respect to each of the enumerated factors and concluded:

---

[1]As appearing in St. 1990, c. 267, § 3, G. L. c. 119, § 61, now provides that if a child over the age of fourteen is charged with murder "there shall exist a rebuttable presumption that the child presents a significant danger to the public and . . . is not amenable to rehabilitation within the juvenile justice system." See *Commonwealth* v. *Wayne W.,* 414 Mass. 218 (1993).

"[T]hat the child presents a significant danger to the public as demonstrated by the nature of the offense charged and the child's past record of delinquent behavior and, further, that he is not now amenable to rehabilitation as a juvenile."

There was ample evidence to support the subsidiary findings. The issue is whether those findings warranted the judge, in the exercise of his discretion, see *Ward* v. *Commonwealth*, 407 Mass. 434, 438 (1990), in reaching the conclusion he did.

The defendant contends that the evidence presented at the transfer hearing, which began in 1988 and was completed on March 29, 1989, when the defendant was seventeen, required a finding that he was amenable to treatment as a juvenile. Two psychiatrists testified, both of whom were of the opinion that the defendant presented a danger to the public. With respect to amenability to treatment, the defendant relies in particular on the testimony of his treating psychiatrist at Winthrop Hospital, Dr. Adela Wilkeson. She diagnosed the defendant as having "mixed personality with depression, passive dependent and antisocial features." Based upon his response to treatment at the hospital while these charges were pending, Dr. Wilkeson stated that she thought the defendant was amenable to treatment. She stated, however, that the treatment would certainly have to continue beyond the defendant's eighteenth birthday, and probably beyond his twenty-first birthday. The defendant also relies on testimony from a probation officer that he had complied with at least some of the probation officer's suggestions. And finally, the defendant relies on evidence from a mental health worker to the effect that counseling had been recommended for the defendant on many occasions in the past, but he had not been afforded the benefit of counseling.

Even if the evidence from Dr. Wilkeson might have warranted a conclusion that the defendant was amenable to treatment as a juvenile, the judge was not bound to accept it. See *Ward* v. *Commonwealth*, 407 Mass. at 438; *Commonwealth* v. *Traylor*, 29 Mass. App. Ct. 584, 586 (1990). The

other psychiatrist who testified gave a different diagnosis, and he described the defendant as difficult to treat. He rated the defendant's prognosis as only "fair." The issue before the judge was whether the defendant could be rehabilitated by age eighteen, see *Commonwealth* v. *Matthews*, 406 Mass. 380, 385-387 (1990); *Ward* v. *Commonwealth*, 407 Mass. at 440, and both of the psychiatrists believed that the need for treatment would continue past that date. It is true that commitment to age twenty-one could have been authorized under G. L. c. 120, §§ 16 & 17, should it have been found beyond a reasonable doubt that, due to a mental or physical disorder, the defendant presented a danger to the public. See *Department of Youth Servs.* v. *A Juvenile*, 384 Mass. 784, 792 (1981). Neither of the psychiatrists expressed an opinion, however, that treatment after age twenty-one would be unnecessary. With respect to the other evidence upon which the defendant relies, in the face of the seriousness of the offense, substantial evidence of other criminal behavior, the frequent other violations of the terms of probation, the defendant's history of severe drug and alcohol abuse, and the previous attempts at rehabilitation which failed, a finding of amenability to treatment was not compelled, and the judge's conclusion to the contrary was warranted.

2. *The motion to suppress.* Upon receiving information that the defendant had been with the victim a short time before he was found dead, the police went to the defendant's house on the evening of the incident. They seized a knife which was visible in his pocket when he answered the door. At the officers' request, the defendant and his father drove in their own automobile to the police station. With his father present, the defendant was questioned by several officers for about an hour. No Miranda warnings were given. In the course of the questioning, the officers requested, and were handed by the defendant, a gold chain and cash from his pocket. The police asked the defendant about the clothing that he had been wearing earlier. The defendant said that he was wearing the same clothes as the previous day. He stated, upon inquiry from the police, that he would be willing to

hand his clothing over to the police. The defendant and his father returned home in their own automobile. The police followed in a separate vehicle, waited while the defendant changed out of his clothes, retrieved the pants and two shirts that the defendant was wearing, and left. The defendant was not arrested until four days later.

The seizure of the knife when the police first arrived at the defendant's home was proper as a reasonable self-protection measure. The knife, in any event, was not tied to the murder. In the absence of Miranda warnings, the validity of any subsequent interrogation, or any warrantless seizures that flowed from the interrogation, depended, first, upon whether at the time they occurred the defendant had been deprived of his freedom of action in so significant a way that, although not formally under arrest, he was in "custody." The judge found that he was not, and we would not disturb that finding unless it was clearly erroneous. In all the circumstances found by the judge, it was not clearly erroneous. See *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984); *Commonwealth* v. *Buckley*, 410 Mass. 209, 217 (1991). The police had only begun their investigation earlier the same day and had questioned another suspect who had also been in the victim's company in the hours before his death. The defendant appeared at the time to have an alibi. The judge warrantably found, therefore, that at the time of the questioning the investigation had not as yet focused on the defendant. Further, it is significant that the defendant had his father with him at all times for advice and support, that they traveled to and from the police station in their own vehicle, that the atmosphere was informal and the questioning was not aggressive, and that no charges were brought until several days later. See *Commonwealth* v. *Barnes*, 20 Mass. App. Ct. 748, 751-752 (1985).

The defendant contends, further, that, even if he was not in custody when his clothing, money, and gold chain were taken by the police, their warrantless seizure violated his Fourth Amendment rights under the United States Constitution. Whether one who hands his property over to the police

at their request voluntarily consents, or merely acquiesces to a claim of lawful authority, presents a question of fact. See Smith, Criminal Practice & Procedure § 252 (1983). The judge found that the defendant did voluntarily consent. As the issue of fact as presented to him was capable of rational resolution either way, we do not disturb his finding. The factors suggesting coercion were the defendant's age, the presence during the questioning at the police station of four police officers, the fact that no one told the defendant he had a right to refuse to hand over the items, and the defendant's testimony that he thought he had no choice. Those factors are not dispositive, however. See *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496-497 (1976); *Commonwealth* v. *Walker*, 370 Mass. 548, cert. denied, 429 U.S. 943 (1976). Compare *Commonwealth* v. *Harmond*, 376 Mass. 557, 561 (1978). The judge apparently disbelieved the defendant's testimony that he felt coerced, as the judge had the right to do, and found that the defendant had cooperated voluntarily in the ongoing investigation. In addition, there was evidence that the officers were not aggressive or overbearing, that nothing was said by the police implying that the defendant had to comply with the requests, that there were no threats or trickery, and that the defendant, having been arrested before, had some familiarity with criminal procedures. The finding on consent was warranted.

3. *Sufficiency of the evidence.* There was ample evidence to support the jury's verdict on both charges. Among other things, it was established that the victim was alive in the early morning of the day of his death, that the defendant and the victim were together in the victim's room until the defendant left the room, closed the door behind him, and began to engage in conversation with the victim's mother in the kitchen. He gave the victim's mother false information about his age and where he lived. He asked her for a ride to a nearby rapid-transit station, and she gave it to him, but she did not see where the defendant went after she dropped him off. She left the station to meet her daughter at around 11:30 A.M. The station was one-third of a mile from the victim's

apartment, and the defendant was familiar with the neighborhood. The fire alarm rang at 11:49 A.M. The fire was of incendiary origin. It probably began about ten minutes before the alarm was sounded. The victim died before the fire started. He had been stabbed with a knife. A blood-stained knife was found in the victim's bedroom. Blood on the clothing the defendant had been wearing that morning matched the victim's blood type. (The blood type involved is shared by only eleven percent of the population.) The victim's watch and wallet were missing when his body was discovered. The watch was found a few days later in the defendant's possession, and money in the approximate amount ($52) in the wallet was also found in the defendant's possession on the evening of the incident, although he had had considerably less money ($7) the day before.

The thrust of the defense at trial was that it would have been impossible for the defendant to have returned to the victim's house and set the fire in the short interval between being dropped off at the rapid-transit station and the start of the fire. Given the distances involved and his familiarity with the neighborhood, the defendant could have returned to the house within a few minutes. He could have left the front door unlocked as he followed the victim's mother out, or he could have entered the apartment with the victim's key. (The victim's keys were missing when his body was discovered, and a key to the apartment was found in the grass in the yard behind the house some months after the incident.) The jury could have found, therefore, that it would not have been impossible for the defendant to have returned to the house and set the fire to avoid detection of the earlier homicide. The evidence of the defendant's guilt was entirely circumstantial but, nevertheless, more than adequate to sustain the verdicts.

4. *The loss of the exculpatory evidence.* The police failed to preserve the defendant's jogging jacket seized in a search authorized by a search warrant. After tests for blood and accelerants were conducted, the jacket apparently was destroyed. The tests were negative. The defendant contends

that the destruction of the jacket denied him exculpatory evidence, thus violating his due process rights. In such circumstances, we are required to balance "the culpability of the Commonwealth [in losing the evidence], the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Olszewski*, 401 Mass. 749, 755 (1988), quoting from *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). Given the absence of any possible prejudice as a result of the missing jacket, it is clear to us that the defendant's due process rights were not violated. The jury were shown a photograph of the jacket and were informed that it was tested by two separate chemists both of whom found no blood or accelerants on it. Further, the Commonwealth's carelessness in handling the jacket was brought out before the jury and relied upon by defense counsel in closing argument. The presence of the jacket at trial would have added nothing to benefit the defense.

*Judgments affirmed.*