COMMONWEALTH vs. GERARD A. McCRA, THIRD.

Plymouth. April 7, 1998. - June 3, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Admissions and confessions, Waiver, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights by juvenile. *Waiver. Words,* "Interested adult."

The record of a criminal proceeding demonstrated that the juvenile defendant, who was fifteen years of age and was being questioned by police regarding the murder of his father, mother, and sister, had an ample opportunity to consult with an interested adult, his aunt, who was informed of and understood the Miranda warnings given to the defendant before he made incriminating statements [567-568] and the defendant's waiver was not rendered involuntary by his aunt's relationship to the victims where there was no hostility or animosity demonstrated between the defendant and his aunt [568-569].

INDICTMENTS found and returned in the Superior Court Department on October 18, 1993.

A motion to suppress evidence was heard by *Robert L. Steadman*, J., and the cases were tried before him.

*Dana Alan Curhan* for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. A jury convicted the defendant of murder in the first degree by reason of deliberate premeditation for the killing of his father, mother, and sister. The defendant was fifteen years old when he committed the murders and confessed to having done so.[1] He argues on appeal that his admissions and confessions were obtained in violation of his constitutional rights. The defendant also requests we exercise our plenary power under G. L. c. 278, § 33E, to reduce or to overturn the verdicts. We reject the defendant's argument and conclude there is no basis for relief under G. L. c. 278, § 33E.

---

[1] The defendant was tried as an adult pursuant to G. L. c. 119, § 61.

1. *Facts.* The jury would have been warranted in finding the following facts: on October 9, 1993, after arguing with his parents, the defendant became angry and decided to kill them. He broke into his grandfather's quarters in the house that they shared and took a gun which he checked to be sure it was loaded. Later on in the day, while his father and his sister were about to leave in the family automobile, he asked to accompany them. He then went inside the house, shot his mother in the back of the head, returned to the waiting automobile, and shot his sister and his father each in the back of the head.

He drove the automobile to an area behind the house and moved his mother's body into his sister's room, locked the door, attempted to clean the bloodied areas, showered, and changed. With the bodies out of view he invited a female friend to visit him, which she did, and they spent the night together in his room.

The next day the defendant, his two aunts, and several cousins went to the Rochester police department to report the missing family members. Two hours later, the police went to the family's house, noticed a broken window and numerous red stains throughout the house, which the defendant explained as being caused by his sister's painting birdhouses red. After several hours the police found the victims' bodies and soon thereafter the defendant admitted to being involved in the killing of his family and was placed under arrest.

2. *The defendant's statements.* At a suppression hearing, the judge found the following facts. At approximately 9 P.M. on October 10, 1993, Chief Walter Denham introduced himself to one of the defendant's aunts, and at his request she agreed to act as the defendant's guardian.

Chief Denham advised the defendant and his aunt of the defendant's Miranda rights. They both indicated they understood the rights and signed forms acknowledging their understanding. The defendant was relaxed, calm, coherent, and responsive to all police questioning. The questions were asked one at a time and the defendant understood the questions. His aunt was present throughout the questioning and understood the questions. The questioning lasted approximately twenty to twenty-five minutes. During this period, the defendant made no admissions. There was no demonstration of animosity, hostility, or arguments between the defendant and his aunt.

State Trooper Paul Petrino also questioned the defendant for

about one hour after which there was a ten- to fifteen-minute break. Petrino spoke with the defendant's aunt before again questioning the defendant. She once more agreed to act as guardian on the defendant's behalf. There was no hostility shown between the defendant and his aunt. The defendant and his aunt were again read the Miranda rights and both stated they understood. His aunt did not press the defendant to answer the questions; he answered responsively and was coherent.

After a break at approximately 11:15 P.M., the questioning was resumed by State Trooper Leonard Coopenrath, who again administered Miranda warnings to the defendant and his aunt. Both said they understood and signed the forms. The defendant's aunt listened carefully to the questions asked of the defendant.

At approximately 12:30 A.M. on October 11, 1993, State police Lieutenant Bruce Gordon interrupted the questioning. Gordon spoke with the defendant's aunt and told her that something bad had happened to her family and that he wished to speak with the defendant. She indicated her willingness to continue to act as guardian and displayed no animosity toward the defendant nor had any reservations concerning her guardianship. Gordon did not seek her aid or assistance in the questioning, nor did she act as an agent for the Commonwealth.

Gordon told the defendant that something bad had happened to his family and that the defendant was involved. The defendant responded that he knew his rights and, when Gordon restated and emphasized the Miranda warnings, that he did not have to say anything.

At that point, Gordon and the defendant heard a police officer state in a loud voice that the bodies had been found. The defendant told Gordon that he wanted to talk to only one person. Gordon got up to leave because he thought the defendant was indicating a desire to speak alone with his aunt. The defendant then stated to Gordon, "No I want to talk to you." His aunt agreed to leave the immediate area but remained close by. She was not asked to leave by Gordon. She knew she did not have to leave and believed she could have stopped the interview if she wanted or could have remained in the room.

Gordon then asked the defendant whether he wanted to talk with him, and the defendant responded, "Yes." The defendant then made a statement involving himself in the killing of his mother, father, and sister. The defendant was not upset and showed no emotion. He was placed under arrest and again given Miranda warnings.

Sergeant Robert Kelleher took the defendant to the State police barracks. State police officers requested that the defendant's aunt come to the barracks so that the defendant could be interviewed. She agreed to continue to act as the defendant's guardian. At approximately 2:45 A.M. on October 11, 1993, the police repeated Miranda warnings to the defendant and his aunt. Both responded that they understood those rights and signed forms indicating their understanding. His aunt encouraged the defendant to tell the truth. The defendant then admitted killing his father, his mother, and his sister. His aunt was present during the entire interview which took place around a table in an interview room. Neither the defendant nor his aunt asked that the questioning stop.

3. *Motion to suppress.* The defendant's principal contention on appeal is that the motion judge erred in failing to suppress the statements he made to police at his house and at the police barracks because he was deprived of the opportunity to consult with an interested adult. In reviewing the motion judge's decision, we accept the judge's subsidiary findings of fact. *Commonwealth* v. *Berry*, 410 Mass. 31, 34 (1991). We proceed to make an independent determination of the correctness of the judge's application of constitutional principles to the facts found. *Id.* " '[C]ourts must proceed with "special caution" when reviewing purported waivers of constitutional rights' by juveniles . . . and certain procedures are to be followed in obtaining a juvenile's waiver of his rights against self-incrimination" (citations omitted). *Commonwealth* v. *Philip S.*, 414 Mass. 804, 808-809 (1993), quoting *Commonwealth* v. *Berry, supra.*

A juvenile defendant over the age of fourteen may properly waive his constitutional rights if, after having been advised of those rights, he was afforded an opportunity to consult with an interested adult who was informed of and understood those rights. *Commonwealth* v. *Berry, supra* at 35, citing *Commonwealth* v. *Guyton*, 405 Mass. 497, 500-502 (1989), and *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 131-134 (1983). "It is not necessary for such a juvenile actually to consult with the interested adult, for it is the *opportunity* to consult that is

critical" (emphasis in original).[2] *Commonwealth* v. *Berry, supra* at 35, citing *Commonwealth* v. *MacNeill*, 399 Mass. 71, 78 (1987). Here the juvenile was at least fourteen years of age and had ample opportunity to consult with an interested adult. Therefore, the waiver was valid without there having been an actual consultation. *Commonwealth* v. *Berry, supra* at 35.

4. *Interested adult.* In this appeal, the defendant argues that he was deprived of a meaningful opportunity to consult with an interested adult because of his aunt's close relationship to the victims and her concern over what happened to them. We disagree.

The purpose of our requirement that a juvenile defendant have an opportunity for a meaningful consultation with a parent, or an adult acting in loco parentis, is to ensure that the juvenile defendant has understood his rights and the consequences of waiving them. See *Commonwealth* v. *Berry, supra* at 35; *Commonwealth* v. *MacNeill, supra* at 77, 79.[3] We do not hold a parent or an interested adult to the standards to which we would hold lawyers in explaining a defendant's rights and the possible consequences of waiver. *Commonwealth* v. *Philip S., supra* at 812 & n.6. The fact that the defendant's aunt was the sister of one of the victims does not require the conclusion that she would be unable to act as an interested adult.

The motion judge found the defendant's aunt to be "an intelligent young woman," having a friendly relationship with the defendant, and who acted "in the best interest of the defendant." See *Commonwealth* v. *Berry, supra* at 36 (juvenile's father was able to fulfil role as interested adult despite emotional distress over seriousness of murder charge against son); *Commonwealth* v. *Tevenal*, 401 Mass. 225, 227 (1987) (juvenile's mother was

[2]Juveniles under the age of fourteen, however, must actually consult with an interested adult in order for their Miranda waiver to be valid. *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134 (1983).

[3]An "interested adult" does not act as defense counsel. There is no merit to the defendant's argument that the police were first required to determine whether his aunt could "provide the defendant with the necessary advice regardless of any conflicting interests." Nor does our rule impose a burden on police officers to make such an inquiry, especially given that the rule does not require investigating officials either to force the adult to speak with the juvenile, or to proscribe the content of whatever discussion takes place. *Commonwealth* v. *Philip S.*, 414 Mass. 804, 812 & n.6 (1996). The "interested adult" rule strikes a balance between protecting a juvenile's rights and the legitimate need of law enforcement officials to question juvenile suspects. *Id.*

interested adult despite defendant's argument that mother became emotional after learning charges facing son). The defendant has not demonstrated otherwise nor that there were facts known to the investigating officers that would have made it "reasonably apparent" to them that the defendant's aunt was "actually antagonistic." *Commonwealth* v. *Philip S., supra* at 809. The judge's findings clearly indicate that the interrogating officers were reasonable in relying on the aunt as an adult interested in the defendant's welfare. Throughout the course of the questioning at the defendant's house and at the police barracks, there were no objective manifestations of animosity or hostility between the defendant and his aunt. *Commonwealth* v. *Berry, supra* at 36. Even as the facts unfolded and the defendant's involvement in the murders was becoming a distinct possibility, she expressed a willingness to continue to act on his behalf, despite her concern for the victims.[4]

The judge properly concluded that the defendant was given an opportunity to have a meaningful consultation with an interested adult before voluntarily waiving his Miranda rights.[5] The defendant, "an intelligent young man" free from "the influence of alcohol or drugs," indicated orally his understanding of the Miranda rights and signed forms to that effect. *Commonwealth* v. *Philip S., supra* at 813 n.7. There was no evidence suggesting that the officers coerced the defendant to speak or urged his aunt to instruct him to do so. See *id.* at 813-814. The defendant has not demonstrated contrary facts to support his contention that his waiver was involuntary. The judge's findings were amply supported by the record. Accordingly, we conclude that the judge's determination that "Miranda warnings were scrupulously furnished, understood, and waived" was correct. *Id.* at 814.

5. *General Laws c. 278, § 33E.* The defendant killed his

---

[4]We reject the defendant's argument that his aunt's presence in the face of the police questioning was "psychologically coercive" to him. Although we have indicated that a defendant may offer evidence to show that the presence of a relative may have affected the voluntariness of a confession, we have not adopted a per se rule suggesting that the mere presence of a relative at questioning would be inherently coercive. See *Commonwealth* v. *Adams*, 416 Mass. 55, 60-61 (1993) (forensic psychiatrist's testimony should have been considered for purposes of voluntariness of confession for humane practice rule).

[5]The defendant concedes that the police properly advised him of his Miranda rights.

family with deliberate premeditation and used calculating efforts to conceal his crimes. We see no basis for exercising our power pursuant to G. L. c. 278, § 33E. See *Commonwealth* v. *Tevenal, supra* at 231; *Commonwealth* v. *MacNeill, supra* at 79.

*Judgments affirmed.*