COMMONWEALTH *vs.* GUTHRIE G., a juvenile.

No. 05-P-47.

Plymouth. October 11, 2005. - June 5, 2006.

Present: DUFFLY, DOERFER, & KAFKER, JJ.

Further appellate review granted, 447 Mass. 1105 (2006).

*Constitutional Law,* Search and seizure, Waiver of constitutional rights by juvenile, Admissions and confessions. *Search and Seizure,* Exigent circumstances, Consent. *Evidence,* Admissions and confessions, Voluntariness of statement. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession.

Police officers were entitled to ask a fourteen year old juvenile questions that were dedicated to locating the whereabouts of a missing weapon without giving the juvenile Miranda warnings, where the fact that the juvenile and his friend had fled from the friend's father with an unknown gun created an exigency [416-417]; further, once the juvenile indicated that he possessed the suspected gun, the officers were justified in asking to see it, the juvenile's consent to produce the gun was freely and voluntarily given, and the juvenile's failure to consent to the officers' accompanying him to its location was of no legal or practical consequence [417-419]; finally, the juvenile and his father had a meaningful opportunity to consult before the juvenile waived his constitutional rights [419-420]. DUFFLY, J., dissenting.

COMPLAINTS received and sworn to in the Plymouth County Division of the Juvenile Court Department on January 13, 2003.

A pretrial motion to suppress evidence was heard by *Kathryn A. White*, J.

*Therese M. Wright*, Assistant District Attorney, for the Commonwealth.

*Susan L. Collins* for the defendant.

KAFKER, J. After his arraignment in Juvenile Court on charges of possession of a firearm, G. L. c. 269, § 10(*a*), and receiving stolen property over $250, G. L. c. 266, § 60, the juvenile successfully moved to suppress the gun as well as inculpatory statements he made to the police. The Commonwealth filed this interlocutory appeal. We reverse.

*Background.* The facts as found by the motion judge were as follows. William Bohmback came to the Middleborough police station on January 11, 2003, to report that his son (born on June 11, 1988) and the juvenile (born on September 17, 1988) might be in possession of a gun. Bohmback reported that when he found the two teenagers in his tool shop working on what appeared to be a gun, they "took off." He also reported that when he thereafter picked up his son at the juvenile's house, four or five miles away, his son jumped out of the car and fled again on foot. Bohmback provided the police with a description of his son and stated that he believed his son would return to the juvenile's residence.

The police radioed a description of Bohmback's son, and Bohmback left the station with Officer Lake. Another officer on patrol responded that he had stopped someone who matched the boy's description, and Officer Lake and Bohmback arrived at the scene. Bohmback identified his son, and Officer Lake questioned the boy about the location of the gun. The son stated that he believed the gun to be a BB gun and that it was at the juvenile's house. Officer Lake, Officer Murphy, and Sergeant Mills then went to the juvenile's home. The juvenile "answered the door and invited the three uniformed police officers inside the living room or possibly the kitchen area." The judge found that the juvenile was home alone during the relevant questioning.

Officer Lake questioned the juvenile about a gun. Although the juvenile "denied knowledge of a gun, when questioned by the officer regarding a BB gun, he admitted that he had a BB gun." Officer Lake then "asked to see the BB gun and [the juvenile went to] retrieve[] it from his bedroom." Officer Lake "followed [the juvenile] to his bedroom without his consent," while Sergeant Mills followed behind them and stood at the threshold of the room. The juvenile removed the gun from the bedroom closet. The gun was later identified as a .22 caliber Rueger. While Officer Lake was in the room, Sergeant Mills observed gun parts in a trash can in the room. The gun parts were seized, as were additional gun parts found underneath the bed.

The police officers instructed the juvenile to accompany them to the police station. Officer Lake also instructed the juvenile to

call his mother and request that she meet him at the station. At the station house, the juvenile was placed in a sitting area to await his mother's arrival. Ultimately, his mother was unavailable, and the juvenile's father went to the police station instead. Officer Lake read the juvenile and his father the Miranda warnings, and the father signed the Miranda forms and was present during the questioning.[1] The juvenile testified that he understood the warnings. The judge found that "Officer Lake did not advise that [the juvenile] and his father had the right to private consultation." The juvenile informed the police that he had had the gun for approximately two days and that he found it at the side of the road.

The motion judge concluded that the juvenile was in custody when he was questioned about the gun at his home and that he should have been given Miranda warnings. She also concluded that "even though the [juvenile] was cooperative in allowing the officers in his home and volunteering to retrieve the BB gun from his bedroom, he did not consent to the search of his bedroom." She further concluded that the juvenile was not given a meaningful opportunity to consult with an adult prior to the station house questioning. She therefore suppressed the gun, its parts, and all the statements the juvenile made.

*Discussion.* A fourteen year old who flees with a gun triggers the heightened public safety concerns and the limited public safety exception to Miranda set out in *New York* v. *Quarles*, 467 U.S. 649, 655-656 (1984),[2] and *Commonwealth* v. *Alan A.*, 47 Mass. App. Ct. 271, 274-275 (1999).[3] In both of those cases, officers in exigent circumstances involving a firearm were al-

---

[1]Officer Lake also testified that he explained to the father "why he was there."

[2]In *New York* v. *Quarles*, 467 U.S. at 651, the United States Supreme Court concluded that "under the circumstances involved in this case, overriding considerations of public safety justify the officer's failure to provide *Miranda* warnings before he asked questions devoted to locating the abandoned weapon." The police officers there had responded to a woman who claimed that she had just been raped by an armed man who had walked into a nearby supermarket. The police cornered the man in the market and discovered he was wearing an empty shoulder holster. After handcuffing him, the officer asked the suspect where the gun was, and the suspect nodded toward some empty cartons and said, "[T]he gun is over there." *Id.* at 652.

[3]In *Commonwealth* v. *Alan A.*, 47 Mass. App. Ct. at 272, a father reported

lowed to ask suspects questions dedicated to locating the missing weapons without being required to give Miranda warnings.

In the instant case, the juvenile and his friend had fled with an unknown gun, thereby creating an exigency. Bohmback, the friend's father, had reported the incident to the police. Bohmback had also reported that the juveniles were working on the gun in a tool shop, which raised other troublesome possibilities. The police did not know if the gun they were looking for was loaded or not. They did know that when the boys fled with the reported gun, they ran for several miles from one boy's house to the other's.[4] "Further, at the time the officer asked the question [about the whereabouts of the gun], he did not know if the gun was . . . in the house or had been disposed of by the juvenile in a public area." *Commonwealth* v. *Alan A.*, 47 Mass. App. Ct. at 275. The boys' behavior had been evasive.

According to the United States Supreme Court, the public safety "exception [to Miranda] will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it." *New York* v. *Quarles*, 467 U.S. at 658. Difficult or not, the exigency described above clearly justified the initial questioning.

Once the juvenile indicated that he possessed the suspected gun, the police were further justified in asking to see it. See *New York* v. *Quarles*, 467 U.S. at 652; *Commonwealth* v. *Alan A.*, 47 Mass. App. Ct. at 273.[5] The juvenile then consented, as the judge found, to produce the gun to the police, and that find-

to police that his son had run away from home with the father's handgun. The police later learned that the gun was loaded and the boy was at a friend's house. When the friend let the police into the house, they ordered the juvenile to lie face down, handcuffed him, read him his Miranda rights, and asked him where the gun was. The juvenile had no opportunity to consult with an adult regarding the Miranda warnings. The trial judge ruled that the public safety exception to Miranda set out in *New York* v. *Quarles*, *supra*, was applicable and therefore the juvenile was not entitled to Miranda warnings or an opportunity to consult with an adult about the warnings, prior to being questioned about the gun. *Commonwealth* v. *Alan A.*, 47 Mass. App. Ct. at 274. We likewise held that the public safety exception was applicable and affirmed. *Id.* at 274-275.

[4]The houses were four or five miles apart.

[5]The dissent assumes the juvenile was telling the truth when he said that the gun was upstairs. See *post* at 423. Given the boys' evasive behavior, and their public flight, the officers, of course, did not need to believe the juvenile.

ing was justified by the evidence. Thus, he cannot be heard to complain that the police came into possession of the gun. There is also no need to address any further issues arising under the Fourth Amendment to the United States Constitution, as the juvenile does not seek to suppress any evidence other than the gun (and its parts), which he consented to produce.

In regard to whether the juvenile consented to produce the gun, the findings are as follows. After some very brief preliminary questioning, "Officer Lake asked to see the BB gun and [the juvenile] retrieved it from his bedroom." In her legal conclusions, the judge also stated, "I find that even though the [juvenile] was cooperative in allowing the officers in his home and volunteering to retrieve the BB gun from his bedroom, he did not consent to search of his bedroom."

The testimony supports the findings regarding the juvenile's consent to get the gun. The juvenile testified that "[t]hey asked me if I had a BB gun, and I said, yes, and I brought them to see it."[6] Officer Lake testified, "I asked him about a gun. . . . He didn't know what I was talking about at first, then when I mentioned the BB gun, said he has one. I asked to see it. He went to his room. I followed for officer safety."

Based on these findings and this record, the Commonwealth has satisfied its burden to demonstrate that the consent to produce the gun was freely and voluntarily given. See, e.g., *Commonwealth* v. *Burgess*, 434 Mass. 307, 310 (2001). Although the age of the juvenile was obviously a significant factor in determining whether that consent was freely and voluntarily given, it does not preclude such a finding.

The motion judge's conclusion that "Officer Lake followed [the juvenile] to his bedroom without his consent" is of no significance.[7] The officers could not let the juvenile go unaccompanied to retrieve the gun without placing themselves at risk. Furthermore, nothing beyond the gun and the gun parts was found in the bedroom. Accordingly, the failure of the juvenile to consent to their accompanying him was of no legal

---

[6]Later on direct examination, he was asked again and he testified, "They asked me if I could go get it and one of them would come with me to go retrieve the BB gun. . . . I went in there and got it for them."

[7]It also has questionable support in the record.

or even practical consequence given his volunteering to get the gun.

Finally, in regard to the station house questioning, the standard is well-established. "A juvenile defendant over the age of fourteen may properly waive his constitutional rights if, after having been advised of those rights, he was afforded an opportunity to consult with an interested adult who was informed of and understood those rights." *Commonwealth* v. *McCra*, 427 Mass. 564, 567 (1998). There is no question that the juvenile and his father were together when Officer Lake read them the Miranda rights and that they remained together during the questioning. Officer Lake also explained to the father "why he was there."[8] The father signed the Miranda forms. "[A]t least with regard to juveniles over the age of fourteen, . . . police officers are not required to give a juvenile and interested adult an unsolicited opportunity to confer in private." *Commonwealth* v. *Philip S.*, 414 Mass. 804, 812 (1993). Additionally, "[i]t is not necessary for such a juvenile actually to consult with the interested adult, for it is the *opportunity* to consult that is critical." *Commonwealth* v. *Berry*, 410 Mass. 31, 35 (1991), *S.C.*, 420 Mass. 95 (1995).

The motion judge here concluded that there had been no opportunity to consult because there was "no indication that [juvenile] was allowed time to consult with his parent as to the meaning of his Miranda rights and to the consequences of waiving this [c]onstitutional right." How this squares as a matter of law with the absence of a requirement that the juvenile and adult be informed that they may confer in private, see *Commonwealth* v. *Ward*, 412 Mass. 395, 397 (1992), and *Commonwealth* v. *Berry, supra* (in which questioning appears to have proceeded right after the warnings were issued),[9] is not clear.

---

[8]We disagree with the dissent's contention that it is appropriate to infer that the judge did not credit Officer Lake's statement that he explained to the father "why he was there." See *post* at 427 n.8. Officer Lake's testimony was uncontested, and there is no indication that the judge found him not credible. Rather, she drew upon his testimony heavily in her findings of fact.

[9]In *Commonwealth* v. *Berry*, 410 Mass. at 33, the court noted that "[u]ntil [the father] arrived, the police scrupulously avoided talking to the [juvenile], and no statements were taken," as was the case here. "Upon [the father's] ar-

If the juvenile and his father understood the Miranda warnings, and there is no argument that they did not,[10] either the father or the juvenile immediately could have asked to discuss the warnings privately or sought to exercise the Miranda rights after they were read. The warnings themselves are meant to promote at least a moment of reflection by both the juvenile and a parent or other interested adult, as are the follow-up questions about their understanding of those rights and the signing of the waiver forms. The presence of the parent and child together also facilitates a request by one or both of them for consultation after the warnings have been read if there is uncertainty in their minds. If such a request has been made, it cannot be refused. See, e.g., *Commonwealth* v. *Ward*, 412 Mass. at 397 ("Surely, the police may not deny them that right [to confer in private]"). There is also nothing in the record to suggest that the father lacked the mental capacity, sobriety, or genuine interest in the juvenile's welfare to provide him with a meaningful opportunity for consultation. *Commonwealth* v. *Berry*, *supra* at 36-37. Consequently, the requirements of a meaningful opportunity for consultation with an adult as defined by *Commonwealth* v. *Berry*, *supra* at 35; *Commonwealth* v. *Ward*, *supra* at 397; *Commonwealth* v. *Philip S.*, *supra* at 812; and *Commonwealth* v. *McCra*, *supra* at 567, have been satisfied.

*Conclusion.* When the juvenile fled with the gun, the police officers had the immediate right, pursuant to the public safety exception, to question the juvenile about the gun without giving him Miranda warnings as soon as they found him at his home.

---

rival, the detective read a card containing the Miranda warnings to both [the father] and the [juvenile]. Both stated that they understood the warnings, and both read and signed the card. There was no discussion at this time between [the father] and the [juvenile]. The [juvenile] then gave an incriminating statement." *Ibid.* The dissent appears to distinguish *Berry* on the ground that prior to the Miranda warnings "[t]he [juvenile] and [the father] spoke alone in the juvenile room for fifteen to twenty minutes during which time [the father] told the [juvenile] that he loved him, and would stay with him." *Ibid.* See *post* at 429 n.10. In *Berry*, the father had reported the son to the police following a violent argument between the father and son. The discussion concerning the meeting in the juvenile room seems to relate to whether the father was genuinely acting to further the interests of his son. *Id.* at 36.

[10]The juvenile testified that he understood his rights.

In response to those questions, the juvenile consented to bring the officers the gun. After securing the gun and the parts the juveniles had cut off the gun, the officers discontinued questioning until the juvenile was joined at the police station by his father, where together they were given, and together they made an informed waiver of, the Miranda warnings. They had an opportunity to consult, but chose not to take advantage of it. The police conduct at issue was legally authorized at each step of the process.

For the reasons stated above, the motion judge's order allowing the motion to suppress is reversed.

*So ordered.*

DUFFLY, J. (dissenting). I write separately because I disagree with the majority opinion insofar as it concludes that the juvenile's consent to produce the gun "was freely and voluntarily given," *ante* at 418, and that the juvenile's opportunity to consult with his father was genuine and meaningful.

*Voluntariness of consent.* The issue as framed by the Commonwealth is whether the juvenile consented to police officers accompanying him to his bedroom to get the gun. The majority focuses on the juvenile's consent to the request by police that he get the gun, concluding that "consent . . . was freely and voluntarily given." *Ibid.* Both views of the issue assume that the police were permitted to ask the juvenile to get the gun from its constitutionally protected location. To analyze the question, it may be helpful to note what the police were, and were not, permitted to do.

I agree that, in light of *New York* v. *Quarles*, 467 U.S. 649, 656-657 (1984), as interpreted by *Commonwealth* v. *Alan A.*, 47 Mass. App. Ct. 271 (1999), the public safety exception applies to the facts of this case, obviating the need for Miranda warnings when questioning is limited to ascertaining whether the gun is in a public place.[1] This exception does not, however, provide a basis to permit a warrantless search for the gun in the

---

[1] We said in *Commonwealth* v. *Alan A.*, *supra* at 275, that the exception applied because "at the time the officer asked the question, he did not know if

juvenile's home.[2] Nor does it permit further questioning regarding the gun in the absence of Miranda warnings (and, where a juvenile is involved, a meaningful opportunity to consult with a

the gun was still in the house or had been disposed of by the juvenile in a public area." This exception appears to encompass questioning about a gun's location so long as an accused has been in public with it. Compare *State* v. *Hendrickson*, 584 N.W.2d 774, 777-778 (Minn. App. Ct. 1998) (questioning about gun's location not within *New York* v. *Quarles* exception because there was no "reason to believe that the gun had been discarded in a public place" merely because defendant, who left home with gun, was apprehended without gun eight hours later).

To the extent that *Commonwealth* v. *Alan A.*, *supra*, appears to permit a search of nonpublic space for reasons of officer safety, I note that after that case was decided, the Supreme Judicial Court in *Commonwealth* v. *Clark*, 432 Mass. 1, 14 (2000), declined to reach the issue whether *New York* v. *Quarles*, *supra*, extends to cases where there is a "speculative threat to an individual officer" or is limited "to those cases in which there is 'a grave threat to public safety.' " There was no discussion in *Commonwealth* v. *Clark*, *supra*, of *Commonwealth* v. *Alan A.*, *supra*, or of *Commonwealth* v. *Kitchings*, 40 Mass. App. Ct. 591, 597-598 (1996), which permitted police questioning about the location of a gun in the absence of Miranda warnings, after the officer had observed an ammunition clip in a rented van he had just stopped.

[2]The Commonwealth makes no argument — and there is nothing in *New York* v. *Quarles*, *supra*, or *Commonwealth* v. *Alan A.*, *supra*, to suggest — that the exception extends to a warrantless search of a suspect's home in the absence of consent or probable cause and exigent circumstances. In *Commonwealth* v. *Martin*, 444 Mass. 213, 217 n.2 (2005), the Supreme Judicial Court rejected, in dicta, the application of the public safety exception to permit a warrantless search of the defendant's home for a gun, even though the defendant, in response to questioning, told them it was in his bedroom closet. In that case, police were dispatched to an apartment following a call from a person claiming that a man at that address had just threatened him with a gun. *Id.* at 215. The police believed the man to be one Martin, the defendant. They proceeded to his apartment, secured the building, and attempted to get Martin to open his door; Martin initially refused, but eventually agreed to surrender. He opened his door and was handcuffed. Police conducted a protective sweep and confirmed no else was present in the apartment. "Although clearly in custody at this point," Martin was not advised of his Miranda rights. *Ibid.* The police told Martin that they could get a search warrant but that Martin could expedite the process by telling him where the gun was located; Martin thereupon said it was in his bedroom closet. *Id.* at 215-216. Police entered and retrieved the gun. *Id.* at 216.

The court noted that the Commonwealth had not contended that the public safety exception to the Miranda requirement was applicable, "and the facts would probably not have supported such a claim. Martin was in custody; his apartment was swept and secured by the police; and there was no basis to conclude that the firearm was anywhere other than in the apartment . . . ." *Id.* at 217 n.2.

parent, see discussion, *infra*). Cf. *Commonwealth* v. *Martin*, 444 Mass. 213, 215, 217 n.2 (2005). See also 2 LaFave, Criminal Procedure § 6.7(b), at 556 (2d ed. 1999) (noting the *Quarles* exception is not broad enough to permit all questioning about a gun's location). The United States Supreme Court observed in *New York* v. *Quarles*, 467 U.S. at 659 n.8, that in *Orozco* v. *Texas*, 394 U.S. 324 (1969), police questioning of the defendant in his bedroom about the gun was impermissible absent Miranda warnings because "clearly investigatory" questions "did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." Compare *Orozco* v. *Texas, supra*; *United States* v. *Mobley*, 40 F.3d 688, 693 (4th Cir. 1994), cert. denied, 514 U.S. 1129 (1995) (*Quarles* exception was inapplicable where the defendant was arrested and a security sweep indicated no one else was in the apartment).

Here, having learned that the gun was not outside, the police could have taken the juvenile into custody, then conducted a sweep of the home and secured it while they obtained a search warrant. Before the juvenile was asked to get the gun, the police were informed that it was in the house[3]; the unarmed fourteen year old posed no danger to the three police officers. There was no longer any exigency supporting a public safety exception.

The majority has decided that, under the umbrella of a public safety exception, the police were permitted, in these circumstances, to ask the fourteen year old suspect to retrieve inculpatory evidence (the gun) from its location in his bedroom, and that his acquiescence to this request was voluntary. The majority then concludes that by agreeing to get the gun, the juvenile

---

[3]There is nothing in the record to suggest that the police believed the gun to be anywhere but in the house at this point. See note 2, *supra*. The narrow exception carved out by *New York* v. *Quarles, supra*, has already been expanded by our decision today applying it to these facts. No witness has suggested the gun was discarded in a public place, and the only testimony on this point indicates that the gun was in the home. If police are permitted to assume that whenever a suspect with a gun has been outside he may have discarded it, then questioning about the gun's location would be warranted in all but a few instances.

exposed the officers to a risk of harm, justifying their following him into his bedroom.[4] *Ante* at 418. Based on these conclusions, the majority did not need to determine whether the juvenile was in custody (as the motion judge found he was[5]) when he was

[4]Once in his bedroom, the juvenile took the gun from the top shelf in his closet where it was located "behind" some unidentified object. Additional gun parts were observed by police in a trash can near the door.

[5]The motion judge concluded that the juvenile was in custody from the time the officers entered his home. This ruling is supported by the following findings of facts: the juvenile was "barely fourteen" at the time; three uniformed officers questioned the juvenile; it was "unlikely . . . that the [juvenile] understood that his cooperation was optional"; the police officers directed the juvenile's actions; and "[t]his was not simply a criminal investigation as the [juvenile] was the only focus of the police action." The judge also ruled that police questioning of the juvenile exceeded the juvenile's invitation to them to step in from the cold and on this basis concluded that the juvenile "should have been read his Miranda rights[, and that] an 'interested adult' should have been available for consultation."

Although "*Miranda* on its face applies to station house questioning," the Supreme Court has "not so limited it in [] subsequent cases . . . ." *New York v. Quarles*, 467 U.S. at 654 n.4, citing, inter alia, *Orozco v. Texas*, 394 U.S. 324 (defendant's bedroom). In *Commonwealth v. Coleman*, 49 Mass. App. Ct. 150 (2000), we reversed the denial of a motion to suppress in circumstances that included the fact that the suspect "aged nineteen, educated to grade eleven," was questioned by three officers in a small bedroom. *Id.* at 151-154. See, e.g., *Commonwealth v. Rubio*, 27 Mass. App. Ct. 506, 512 (1989) (suspect, surrounded by officers, "confined" to kitchen chair, was in custody). Cf. *Commonwealth v. Barros*, 56 Mass. App. Ct. 675, 677-678 & n.2 (2002).

This case may be distinguished from *Commonwealth v. Sneed*, 440 Mass. 216, 220-221 (2003), where the mature individual voluntarily admitted into her home an unarmed, plain clothes State trooper and a civilian investigator; she sat and talked with them in her living room for two hours, freely leaving the room at least twice. Although a reasonable adult in such circumstances may not have felt that her freedom of action was curtailed, the suspect here was a "barely fourteen" year old juvenile, who was home alone when three uniformed officers arrived at his doorstep. A reasonable juvenile faced with an "impressive police presence," *Commonwealth v. Larkin*, 429 Mass. 426, 432-433 (1999), who is questioned within the isolated confines of his home would not have felt free to decline to answer their questions or refuse their request to get the gun.

Moreover, as the motion judge found, upon admitting the three officers inside his home, the juvenile was immediately subjected to questioning about the gun, and "[t]his was not simply a criminal investigation as the [juvenile] was the only focus of the police action," further distinguishing this case from *Commonwealth v. Sneed, supra*, where the adult, "at the outset of the questioning, . . . was informed only that her visitors 'would like to talk to her about her job,' " and for first half of the interview was questioned in general terms and not about the missing money that was the subject of the investigation.

asked questions that went beyond the initial public safety inquiry as to the gun's location.[6]

Even if the juvenile was not in custody when he was asked by police to get the gun, thereby obviating the need to give Miranda warnings and to provide a genuine opportunity to consult with an adult, the juvenile's consent to the request to retrieve the gun from the bedroom while accompanied by police must have been voluntary and not a mere acquiescence to a show of authority. *Commonwealth* v. *Rogers*, 444 Mass. 234, 241 (2005).

Whether the focus is on the juvenile's consent to get the gun, or (as framed by the Commonwealth) on his consent to a search of his bedroom, it was the Commonwealth's burden to establish the voluntariness of such consent. "When a prosecutor relies upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Commonwealth* v. *Krisco Corp.*, 421 Mass. 37, 46 (1995), quoting from *Bumper* v. *North Carolina*, 391 U.S. 543, 548-549 (1968). See *Commonwealth* v. *Rogers, supra* at 238 (Commonwealth must establish that an occupant's words or conduct amounted to more than "mere acquiescence to a claim of authority or simple resignation to the perceived power of uniformed officials").

"Voluntariness of consent 'is a question of fact to be determined in the circumstances of each case.' " *Commonwealth* v. *Krisco Corp., supra*, quoting from *Commonwealth* v. *Harmond*, 376 Mass. 557, 561 (1978). See *Commonwealth* v. *Greenberg*, 34 Mass. App. Ct. 197, 201-202 (1993) ("Whether one who hands his property over to the police at their request

---

[6]The Commonwealth's view of the issue assumes that the juvenile's consent to enter the home extended to a search of his bedroom and that his consent to have police accompany him into the bedroom was voluntary. "It is a settled principle that the proper scope of a consensual search is no greater than the consent given." *Commonwealth* v. *Brown*, 32 Mass. App. Ct. 649, 652 (1992). "Waiver of constitutional rights must be unequivocal and specific." *Commonwealth* v. *McGrath*, 365 Mass. 631, 632 (1974). The judge's findings are not challenged by the Commonwealth and support her conclusion that "the [juvenile's] scope of invitation to the officers extended to the living room or, perhaps, the kitchen. [The juvenile] did not give the officers permission to either follow him through the house, to his bedroom or to search his bedroom."

voluntarily consents, or merely acquiesces to a claim of lawful authority, presents a question of fact. See Smith, Criminal Practice & Procedure § 252 [1983]"). As Professor LaFave observed, the Supreme Court in *Schneckloth* v. *Bustamonte*, 412 U.S. 218 (1973), "adopted the 'traditional definition of voluntariness' from confession cases as the test for determining when a valid consent to search was given. . . ." 4 LaFave, Search and Seizure § 8.2(e), at 95 (4th ed. 2004). See *Schneckloth* v. *Bustamonte, supra* at 229 ("there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness' ").[7]

Applying these standards to the facts found by the motion judge (none of which are challenged by the Commonwealth), I do not agree that the juvenile's response to the officer's request to retrieve the gun, or to their accompanying him when he went to get it, was voluntary. The three uniformed officers remained standing while they questioned the fourteen year old juvenile, who was at that point home alone. See *Commonwealth* v. *Harmond*, 376 Mass. at 561-562 (presence of several uniformed officers may suggest the absence of voluntary consent, though that fact standing alone does not compel such a finding); *Commonwealth* v. *Greenberg, supra* at 202 ("factors suggesting coercion were the defendant's age, the presence during the questioning at the police station of four police officers, the fact that no one told the defendant he had a right to refuse to hand over the items, and the defendant's testimony that he thought he had no choice"). There is no evidence that the juvenile was ever told that he did not have to agree to their request to get the gun. He was not told that the police wanted to search his home, nor was he asked if they could follow him into his bedroom after he agreed to get the gun. The police did not inform the

---

[7]Our cases have not articulated the level or quantum of the burden that is imposed on the Commonwealth when it seeks to establish that consent to cross a constitutionally protected threshold was voluntarily given. In *Schneckloth* v. *Bustamonte*, 412 U.S. at 226, the Supreme Court said only that in the context of consent to search, the voluntariness inquiry involves "a careful scrutiny of all the surrounding circumstance"; "the most careful scrutiny," *id.* at 229; and a "careful sifting of the unique facts and circumstances of each case," *id.* at 233. See *United States* v. *Matlock*, 415 U.S. 164, 177 n.14 (1974) ("the controlling burden of proof at suppression hearings [is] . . . no greater . . . than proof by a preponderance of the evidence").

juvenile that he had a right not to consent to the search or their following him, a fact that, while not dispositive, "is relevant with regard to the voluntariness of the consent." *Commonwealth v. Krisco Corp.*, 421 Mass. at 46.

In my view, the Commonwealth has failed to establish that the juvenile's consent to get the gun, and his silence when the police officers followed him, was not a mere acquiescence to a show of authority. I would affirm the order suppressing the gun and other evidence found in the juvenile's bedroom.

*Station house questioning.* Officer Lake testified he knew the boy was a juvenile. After instructing the juvenile to call his mother, then transporting him to the police station, the police placed the juvenile in a sitting area to await her arrival. The mother later called the station to say she was not near enough to make the trip, "so her ex-husband was coming." Immediately upon the father's arrival, Officer Lake read Miranda rights to the juvenile and his father, the father signed the Miranda forms, and the juvenile was asked where he got the gun. The judge made no finding that the father had been informed of the reason his son was in custody.[8] The judge explicitly found:

> "No evidence was presented as to whether the [juvenile] was given an opportunity to consult with his father, regardless of whether or not [the juvenile] and his father chose

[8]In light of her ruling, and because the judge did not always accept the officer's testimony (finding, for example, as testified to by the juvenile, that an officer searched under his bed, although the officer testified that he had not and could not recall if another officer had done so), I think it may be inferred that she did not credit Officer Lake's statement that, after administering Miranda warnings to the father and the juvenile, he "explained why he was there." In any event, it is not apparent from this bare statement what was explained, or to whom (the officer could have explained that both were going to be given Miranda forms).

Consultation serves the purpose, among others, of assuring that the juvenile understands "the potential consequences of waiving [his rights] before talking to the police." *Commonwealth v. MacNeill*, 399 Mass. 71, 79 (1987). It is difficult to conceive how an appreciation of the potential consequences is to be achieved unless the juvenile and his parent know, in light of the potential criminal charges, what is at stake. Because I think this is a significant factor in the analysis of whether consultation was meaningful, I would not conclude that the judge would have made a finding, on this record, that the officer informed the juvenile and his father of the criminal charges with which the juvenile was ultimately charged.

to consult. . . . There is no indication that [the juvenile] was allowed time to consult with his parent as to the meaning of his *Miranda* rights and to the consequences of waiving this [c]onstitutional right."

The question presented is whether a mere showing that a parent is present when Miranda forms are signed affords the sort of "genuine" or "meaningful opportunity to consult" contemplated by our decisional law, which imposes upon the Commonwealth a "heavy burden" to demonstrate a waiver of the privilege against self-incrimination, and admonishes our courts to exercise "special caution" when reviewing a claim that a juvenile has waived his constitutional rights. *Commonwealth* v. *Berry*, 410 Mass. 31, 34 (1991), *S.C.*, 420 Mass. 95 (1995)..

I do not agree that this heavy burden is met when (1) the fourteen year old juvenile has had no opportunity to meet with his father, publicly or in private, at or near the time Miranda warnings are given; (2) the juvenile and his father have not been informed that they have a right to consult; (3) the parent has not been informed of the reason the juvenile is in custody; and (4) police do not request permission to ask the juvenile questions, but commence interrogation of the juvenile immediately following reading of the warnings. No decision of our appellate courts concludes, on these facts, that the opportunity to consult was genuine.

In *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 379-380 (2003), the opportunity to consult was not meaningful, where a fifteen year old juvenile declined repeated offers to have police contact his mother. He told police that he had previously been arrested; a detective then read the juvenile his Miranda warnings and "asked the juvenile whether he understood his rights, and specifically asked him if he was aware of those rights as a result of his previous arrests. The juvenile stated that he was aware of his rights. After giving the juvenile his Miranda warnings, the detective asked the juvenile if he wanted them to contact or get his mother and have her present during the interview." *Ibid.* The court held that "the offers made here did not amount to the 'genuine opportunity' for consultation required

by our cases." *Id.* at 381. Compare *Commonwealth* v. *McCra*, 427 Mass. 564, 566 (1998).[9]

There is "no fixed rule that a minor's opportunity to have meaningful consultation with an interested adult . . . requires that the police expressly inform the minor and the adult they may confer *in private*" (emphasis added). *Commonwealth* v. *Ward*, 412 Mass. 395, 397 (1992) (juvenile and his mother were read rights and both indicated they understood them; when offered the opportunity for consultation, mother and son decided no consultation was necessary). Nor is actual consultation necessary, but "the *opportunity* to consult . . . is critical." *Commonwealth* v. *Berry*, 410 Mass. at 35.[10] "[T]he ultimate question is whether the juvenile has understood his rights and the

---

[9]The fifteen year old in *Commonwealth* v. *McCra, supra,* was at the police station with his aunt, who was acting as his guardian; both were read Miranda rights and both indicated orally and in writing they understood these rights. *Id.* at 565. The police questioned the juvenile over a period of several hours, during which breaks were taken and Miranda warnings repeated before questioning resumed. *Id.* at 565-566. After what appears to have been two breaks, the police informed the aunt and the juvenile that "something bad" had happened to their family, and that the juvenile was involved. *Id.* at 566. When it was announced within their hearing that "the bodies had been found," the juvenile told the officer he wanted to speak with him; his aunt agreed to leave the immediate area but remained close by. *Ibid.* At this point, the juvenile made inculpatory statements and he was arrested and again administered Miranda warnings. *Ibid.* The juvenile was then taken to State police barracks and his aunt was asked by police to accompany the youth so that he could be interviewed. *Id.* at 567. "His aunt encouraged the [juvenile] to tell the truth. The [juvenile] then admitted killing his father, his mother, and his sister. His aunt was present during the entire interview which took place around a table in an interview room. Neither the [juvenile] nor his aunt asked that the questioning stop." *Ibid.* The court held that the juvenile "had ample opportunity to consult with an interested adult. Therefore, the waiver was valid without there having been an actual consultation." *Id.* at 568.

[10]The father in *Commonwealth* v. *Berry, supra* at 32, had been called by police and informed that his sixteen year old son was charged with murder. Upon the father's arrival at the police station, he met with his son for up to twenty minutes in the juvenile room, then returned home. When the juvenile stated he wished to make a statement, the father was called immediately. He returned to the station and Miranda warnings were given. "Both the [juvenile] and his father expressly stated that they understood the warnings; both read and signed the Miranda card; both knew the charges against the defendant . . . ." *Id.* at 35. It was "[o]n these facts" that the court concluded "that the [juvenile] had an opportunity for a meaningful consultation with his father, that he understood his rights and the potential consequences of waiving them before he gave his statement, and that he considered a *further consultation*

potential consequences of waiving them before talking to the police." *Commonwealth* v. *MacNeill*, 399 Mass. 71, 79 (1987). "The 'genuine opportunity' for consultation that our cases envision is not merely a theoretical opportunity, that the juvenile may utilize at some future time, but an opportunity that is immediately and evidently available to the juvenile before the juvenile waives his or her rights." *Commonwealth* v. *Alfonso A.*, 438 Mass. at 382.

The availability of this genuine opportunity provides some assurance that a juvenile has access to a supportive and knowledgeable adult who can advise him about the meaning of the rights under Miranda and the significance of waiving them.[11] "The special protection of the constitutional interests of minors is derived from empirical studies which concluded that 'most juveniles do not understand the significance and protective function of these [constitutional] rights even when they are read the standard Miranda warnings.' " *Commonwealth* v. *Philip S.*, 32 Mass. App. Ct. 720, 728 (1992), *S.C.*, 414 Mass. 804 (1993), quoting from *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 131 (1983).

In my view, the cases establish that in order for the opportunity to consult to be genuine or meaningful and not illusory or theoretical, at a minimum (1) the parent and the juvenile must be informed of the nature of the charges facing

with his father unnecessary" (emphasis added). *Id.* at 36. In light of this language and these facts, I do not agree with the majority that *Berry* stands for the proposition that a meaningful opportunity may be found even in the absence of any time to consult and where the parent, from all that appears, does not know the nature of the criminal charges facing his child. See *ante* at 420.

[11]The majority takes note of the fact that at the hearing on the motion to suppress the juvenile said "Yeah," in response to the question (regarding Miranda rights), "[D]id you understand what they were saying?" See *ante* at 420 n.10. The requirement of genuine consultation would be meaningless if a juvenile's statement that he understood what was said (made well after the waiver, when the statement might well have been based on subsequent consultation) suffices to establish his understanding of the significance of his rights and the effect of his waiver of them. "The purpose of our requirement that a juvenile defendant have an opportunity for a meaningful consultation with a parent, or an adult acting in loco parentis, is to ensure that the juvenile defendant has understood his rights and the consequences of waiving them." *Commonwealth* v. *McCra*, 427 Mass. at 568.

the juvenile; and (2) the parent must be physically present with the juvenile for a sufficiently long period of time prior to a waiver of Miranda rights, as would permit consultation should they wish to engage in it. These minimally protective factors were not found to be present here. I therefore disagree with the majority's view, *ante* at 420, that "the requirements of a meaningful opportunity for consultation . . . have been satisfied."[12]

---

[12]In the absence of "a meaningful consultation with the parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent[,] . . . the circumstances should demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." *Commonwealth* v. *A Juvenile*, 389 Mass. at 134. A reviewing court must " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Id.* at 135, quoting from *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938). The Commonwealth presented no evidence that the juvenile was possessed of a high degree of intelligence, experience, knowledge, or sophistication. The motion judge was correct to conclude that the Commonwealth failed to sustain its heavy burden of demonstrating a knowing and intelligent waiver by the juvenile.