COMMONWEALTH *vs.* LEON L., a juvenile
(and five companion cases[1]).

Nos. 99-P-796 & 99-P-797.

Worcester. November 13, 2000. - October 15, 2001.

Present: BROWN, GREENBERG, & GELINAS, JJ.

*Constitutional Law,* Admissions and confessions, Parent and child, Waiver of constitutional rights. *Evidence,* Admissions and confessions. *Waiver.*

In the circumstances, police officers conducting a custodial interrogation of two juveniles had before them objective facts indicating that the juveniles' mothers were interested adults who comprehended the events attending their sons' arrest and the officers' administration of Miranda warnings and who could assist the juveniles in the choices they had to make. [826-827]

At a hearing on a joint motion by two juveniles to suppress statements they had made to the police, contending that the statements were elicited in violation of *Miranda* v. *Arizona,* 384 U.S. 436 (1966), the judge properly concluded that the Commonwealth failed to sustain its burden on the issue of the voluntariness of the juveniles' statements, where the judge found that each of the juveniles was emotionally upset throughout their interview with police and, given their youth, the persistent nature of the questioning, the overbearing demeanor of one of the officers, and the officers' threats, there was enough evidence to support the judge's ultimate conclusion that the juveniles' admissions resulted from police pressure and unfair tactics. [828-830]

COMPLAINTS received and sworn to in the Worcester Division of the Juvenile Court Department on October 21, 1998.

A pretrial motion to suppress evidence was heard by *Jan Lewis Najemy,* J.

An application for an interlocutory appeal was allowed by *John M. Greaney,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

---

[1]Two of the cases are against Leon L., and three are against Carl C., a juvenile.

*Thomas W. Dee*, Assistant District Attorney, for the Commonwealth.

*Steven J. Bolivar* for the defendant.

GREENBERG, J. In Worcester, an historic one hundred year old dining car, which had graced various public places over the years, suffered severe damage on October 20, 1998. Vandals set it ablaze at East Park late at night. Every effort was made to douse the fire, but the diner sustained severe damage. A police investigation ensued that focused on two juveniles, Leon and Carl, whose statements to the police are the subject of this appeal.[2] Complaints filed in the Juvenile Court charged them with burning a building (G. L. c. 266, § 2); malicious destruction of personal property valued at less than $250[3] (G. L. c. 266, § 127); and breaking and entering in the daytime with intent to commit a felony (G. L. c. 266, § 18). The juveniles moved to suppress statements they made to the police, contending that the statements were elicited in violation of *Miranda* v. *Arizona*, 384 U.S. 436 (1966). This is the Commonwealth's appeal of an order of a Juvenile Court judge allowing the juveniles' joint motion to suppress the confessions.

We give a condensed account of the motion judge's findings, with amplification of uncontested facts from the record. On October 20, 1998, Detectives Michael Sabatalo and Michael Mulvey of the Worcester police arson squad drove to fourteen year old Leon's home to question him. Once there, Sabatalo found that Leon's mother spoke no English. A neighbor was called to translate. Leon was not home. His mother left to bring him back from a nearby basketball court.

When Leon and his mother returned to the house, Mulvey observed that Leon spoke and understood only "broken English." The detectives made a decision to take the mother and son to the police station. They agreed, and Sabatalo drove them in an unmarked police van while Mulvey traveled in a separate vehicle. There was no one to interpret en route, but it does not appear that any conversation of consequence occurred.

---

[2]We employ the use of pseudonyms as is our custom in juvenile cases.

[3]The parties state in their respective briefs that the defendants were charged with destruction of property valued in excess of $250. The delinquency complaints, however, plainly state that the value was less than $250.

At the station, Leon and his mother waited in an interview room for the interpreter to arrive. While waiting for the interpreter, Sabatalo began speaking to Leon in a raised voice and banging his open hand on the table. Leon's mother did not understand what Sabatalo said, but his anger was so apparent that she broke down and cried.

The tension was broken when Officer Miguel Lopez, who was bilingual and had no part in the investigation of the fire, came to interpret for Leon and his mother. Lopez explained Leon's Miranda rights in English and Spanish. Both Leon's and his mother's signatures appear on the Miranda warnings form, his signature appearing below the English version and hers beneath the Spanish one.

After Lopez completed the Miranda warnings, Sabatalo and two other officers left the room so that Leon and his mother could speak with each other alone. When the officers returned, the questioning began, with Officer Lopez translating. Leon denied any involvement with the fire. Sabatalo told him that someone named Michael Brown had spoken to the police and had implicated Leon and thirteen year old Carl as the persons who set the fire. After speaking with his mother and with Officer Lopez, Leon, in response to Sabatalo's questions, broke down and admitted being a participant. His answers were transcribed, and it was this document that he sought to suppress.

Carl arrived at the police station after Leon. Miranda warnings, in Spanish and English, were read to him and his mother. Lopez again served as an interpreter. Both Carl and his mother signed a waiver card indicating their understanding of the warnings. At first, Carl denied any wrongdoing. Carl was crying, and his mother was nervous. His mother left the room briefly to use the ladies' room. When she returned, Carl was in the process of making a statement confessing his involvement in the fire. Carl's mother was having difficulty understanding the nature of the interrogation. She became distraught and uncertain as to what to do. In her testimony, she described Carl as "nervous" and "crying" throughout the time he made the statement.

The judge concluded that the juveniles' motion to suppress should be allowed because the Commonwealth had not shown

that either mother was an "interested adult" under *Commonwealth* v. *Philip S.*, 414 Mass. 804, 809-810 (1993), and that "[e]ven with the assistance of an interpreter, the mothers did not sufficiently understand their sons' situations." As an alternative basis for allowing suppression, the judge concluded that Sabatalo's conduct and the totality of the circumstances surrounding the questioning of the juveniles intimidated the juveniles to the extent their statements were involuntary. In reaching the conclusion about involuntariness, the judge relied on Sabatalo's overbearing demeanor, the juveniles' lack of experience with police questioning procedure, and the chilling effect Sabatalo's behavior had on the mothers' ability to counsel their sons. In reviewing the judge's action, we accept "the judge's subsidiary findings of fact absent clear error, give[] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995).

1. *The interested adult issue.* Such limits as bear on the ability of the police to interview a juvenile suspected of committing a crime were discussed in *Commonwealth* v. *Berry*, 410 Mass. 31 (1991), and *Commonwealth* v. *Philip S.*, 414 Mass. at 809-810. In questioning a juvenile who has attained the age of fourteen, the police must provide a genuine opportunity for a meaningful consultation with an interested adult prior to obtaining a Miranda waiver. *Commonwealth* v. *McCra*, 427 Mass. 564, 567 (1998). Juveniles like Carl, under age fourteen, must actually consult with the interested adult before a valid waiver of rights can occur. *Id.* at 567 n.2. The interested adult must understand the meaning of the juvenile's rights. See *Commonwealth* v. *Guyton*, 405 Mass. 497, 501 (1989).[4] The adult, viewed from the perspective of the officials conducting the interview, assessed by objective standards, must have the capac-

---

[4]Where a juvenile over fourteen years of age does not have an opportunity to consult with a parent, adult, or attorney prior to making a statement, that circumstance by itself does not render the juvenile's inculpatory statement inadmissible. See *Commonwealth* v. *King*, 17 Mass. App. Ct. 602, 610-611 (1984). Other factors include the maturity of the juvenile for his age, his experience with police procedures, whether he or she was subjected to physi-

ity to appreciate the juvenile's situation and render advice. See *Commonwealth* v. *Philip S.*, 414 Mass at 809. Concerning the consultation between the interested adult and the juvenile, there is no fixed rule that requires the police to inform them that they may confer in private. See *Commonwealth* v. *Ward*, 412 Mass. 395, 397 (1992). It is required, however, for the police to at least provide an opportunity for the parent, attorney, or other interested adult to meet alone before questioning begins. "The ultimate question is whether the juvenile has understood his rights and the potential consequences of waiving them before talking to the police." *Commonwealth* v. *Berry*, 410 Mass. at 35, quoting from *Commonwealth* v. *MacNeill*, 399 Mass. 71, 78 (1987).

The judge stated in her findings that both mothers were not interested adults because they did not sufficiently understand the significance or meaning of the Miranda warnings. Lopez, who was called by Sabatalo to act as an interpreter for Leon's mother and who played no role in the investigation of the fire, testified that after conversing with her, she stated to him that she understood the warnings. When Leon's mother was questioned by defense counsel on the point, she responded, "I didn't understand but I could see [Sabatalo's] character coming through because he was talking to [Leon] really loud, and he was hitting the table, and he was pressuring him."

It appears from the record that each juvenile briefly spoke alone with his mother: once before signing the waiver and a second time during the interrogation process. As the two questioning sessions progressed, each mother repeatedly interrupted to ask Lopez about what was happening, and each juvenile conferred with Lopez on his own prior to answering Sabatalo's questions. Given these circumstances and the narrowly tailored test described in the *Philip S.* case, it appears that the officers conducting the interview had before them "objective facts indicating that [the mothers were] parent[s] who comprehended the events that occurred and were occurring and who could assist [the juveniles] in the choices [they] had to make." *Commonwealth* v. *Philip S.*, 414 Mass. at 810.

cal or psychological pressures, and whether he or she was kept in a noncoercive environment. *Ibid.*

2. *The voluntariness issue.* Although we conclude that the waivers were knowingly executed, the second question raised in this appeal is whether the ensuing answers to the questions put by Sabatalo were voluntary. That determination involves examining "the totality of the circumstances surrounding the making of the statements themselves in an effort to determine whether they were the product of a 'rational intellect' and a 'free will.' " *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995), quoting from *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995). Due process requires a separate inquiry into the voluntariness of the statement, apart from the validity of the Miranda waiver. See *ibid.* The factors we take into consideration include "promises or other inducements, conduct of the [juvenile], the [juvenile's] age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the [juvenile] or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001), quoting from *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982).

Of Leon's background and experience, we know that he came from the Dominican Republic to Worcester in 1994, four years prior to the events in question. At the station house he was frightened and upset. In and of itself, such manifestations may be insufficient to render a confession involuntary, but taken together with other factors, they warrant the judge's findings. As the interview began, Sabatalo slammed his hand on the table where Leon sat. According to the judge's findings, "Sabatalo was speaking loudly . . . and pressuring [Leon] to make a statement." The judge emphasized in her findings that "the circumstances surrounding the juvenile['s] making [his] statement[] intimidated [him] to the extent that [the] statement[] [was] involuntary." At first, Leon denied any complicity starting the fire; then he spoke with Lopez, who urged him to admit any wrongdoing.

As for Carl's biography, we know less than of the defendant Leon because Carl chose not to argue his case or file a brief.

From the transcript, however, we learn that the family moved to the United States from Puerto Rico in 1997, and that at the time of the fire, Carl had failed to complete the sixth grade. He was thirteen years of age at the time of the police interview. He initially denied any involvement in setting the fire. When he finally confessed, he was crying, nervous, and "not allowed to take a break." At some point while answering Sabatalo's questions or shortly thereafter, Carl stated to his mother that the police had told him that if he did not plead guilty, he would be locked up alone.

The judge was within her discretion in finding that Leon and Carl, who had only been in the United States for a short time, were unable to withstand the pressure to confess. There was strong evidence that their admissions were the product of Sabatalo's inquisitorial style. The juveniles' emotional states and those of their mothers, as described in the judge's findings, indicate a loss of mental freedom of action. There is lacking proof beyond a reasonable doubt, see *Commonwealth* v. *Allen,* 395 Mass. 448, 456-457 (1985), of the juveniles' voluntary participation at the point Sabatalo pressured each of them to confess.[5] Nor did the motion judge make any finding that the situation changed during any stage of the interrogation.

It is instructive to compare the instant cases to *Commonwealth* v. *LeBlanc,* 433 Mass. 549, 554-556 (2001), in which the defendant, when he did decide to tell his story, narrated his version slowly and carefully and the court held it was "not the product of 'inquisitorial activity.' " *Id.* at 555. We also distinguish *Commonwealth* v. *Williams,* 388 Mass. 846, 853-856 (1983), in which a seventeen year old defendant who had no relatives available, but who appeared to the interrogating officer to be nineteen to twenty years old, did not demonstrate any factor, including his age and the absence of relatives, that "interfer[ed] with the defendant's ability to make a voluntary

---

[5]In *Commonwealth* v. *Tavares,* the Supreme Judicial Court held that the Commonwealth must prove the voluntariness of a defendant's statement beyond a reasonable doubt before submission to the trier of fact. 385 Mass. at 152. See *Commonwealth* v. *Allen, supra* at 456-457. The standard was imposed on the basis of Massachusetts "humane practice" and is not constitutionally compelled. See *Commonwealth* v. *Harris,* 371 Mass. 462, 469-470 (1976).

and knowing waiver . . . ." By contrast, in the instant case, the judge found that each of the juveniles was emotionally upset throughout the interview. Given their youth, the persistent nature of the questioning, the overbearing demeanor of Sabatalo, and the threats, there is enough to support the judge's ultimate conclusion that the juveniles' admissions resulted from police pressure and unfair tactics.[6]

We thus agree with the motion judge's conclusion that the Commonwealth failed to sustain its burden on the issue of the voluntariness of the juveniles' statements. Accordingly, we affirm the order allowing the juveniles' motions to suppress.

*So ordered.*

---

[6]In *Commonwealth* v. *Coleman*, 49 Mass. App. Ct. 150, 155 (2000), where the issue was whether a custodial interrogation took place, we described a situation paralleling the judge's findings in the instant case with respect to the "voluntariness" issue: *"Nature of interrogation.* The questioning was aggressive and persistent. The defendant's denials were scorned and overridden. Indeed, the interview was largely one-sided; there was little contribution by the defendant. Although voices may not have been raised, and a conversational tone maintained, the substance of what was said was harsh and intended by the questioner to be so. The interrogatory part of 'custodial interrogation' looks to 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect,' and such was the interrogation here" (citation omitted).