COMMONWEALTH *vs.* QUINT Q., a juvenile.

No. 12-P-1154.

Suffolk. May 8, 2013. - November 12, 2013.

Present: CYPHER, VUONO, & MEADE, JJ.

*Constitutional Law,* Admissions and confessions, Parent and child, Voluntariness of statement, Waiver of constitutional right by juvenile. *Practice, Criminal,* Motion to suppress, Waiver, Voluntariness of statement. *Waiver. Words,* "Interested adult."

In a criminal case, a Juvenile Court judge, in allowing the fifteen year old juvenile's motion to suppress his statements to police, erred in deciding the motion solely on the ground that the mother's "domineering" conduct not only deprived the juvenile of the guidance of an interested adult but also rendered his statement involuntary, where the issue was not raised in the juvenile's motion and therefore the Commonwealth was not put on notice that it would need to litigate it, and where the judge did not seek input from the parties on the issue [513-515]; in any event, the record did not support the judge's finding that the juvenile's mother was not an interested adult, where she understood the reason the juvenile had been arrested and was being questioned, was concerned about his future, and was engaged throughout the interview, and where there was no objective manifestation of animosity toward the juvenile [515-518]; further, in the totality of the circumstances, there was no support for the judge's finding that the juvenile's statement was involuntary, where his mother's conduct was not coercive, where the juvenile was at least of average intelligence and had prior experience with the criminal justice system, and where statements by the police that they would speak to authorities on his behalf did not constitute improper minimization [518-520].

COMPLAINT received and sworn to in the Suffolk County Division of the Juvenile Court Department on March 29, 2011.

A pretrial motion to suppress evidence was heard by *Peter M. Coyne*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Robert J. Cordy*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Sarah H. Montgomery*, Assistant District Attorney, for the Commonwealth.

*Michael A. Contant* for the juvenile.

CYPHER, J. A complaint issued in the Suffolk County Division of the Juvenile Court Department charging the juvenile with breaking and entering in the daytime with the intent to commit a felony therein, G. L. c. 266, § 18. The juvenile filed a motion to suppress statements he made at the police station during an interrogation. During the interrogation, the juvenile, age fifteen years and eight months at that time, made oral admissions that earlier that day, he had taken a tool from his high school and, in the company of two friends, used it to pry open the door to a house located at 35 Darling Street in the Mission Hill area of Boston, which the three then entered. Later in the fifty-minute interview, the juvenile admitted to breaking into five other homes on earlier dates. The statement was electronically recorded with his consent, and that audio recording was admitted in evidence at the suppression hearing.

In the juvenile's motion papers, he argued that he was not afforded an opportunity to consult with an interested adult, i.e., his mother, and that the police use of an interrogation technique known as "minimization," combined with implied promises of leniency, rendered his statement involuntary. After a review of the exhibits and an evidentiary hearing, a judge allowed the motion, concluding that the juvenile's statement was not voluntary because he had been coerced by the "domineering" conduct of his mother throughout the interview, and that he was deprived of the presence of an interested adult, also based on her conduct.[1] The Commonwealth appealed,[2] arguing that the motion should not have been granted on grounds not litigated at

---

[1]According to the Commonwealth, the judge issued findings and rulings on March 9, 2012, but the Commonwealth instead relies on the judge's "amended findings of fact, rulings of law and order on defendant's motion to suppress," issued three days later. The juvenile does not object. The judge's "initial" findings and rulings are not included in the record on appeal.

[2]The Commonwealth filed a timely notice of appeal in the Supreme Judicial Court for Suffolk County and was permitted to appeal, see Mass.R.Crim.P. 15(e), as appearing in 422 Mass. 1501 (1996). The juvenile argues that the single justice improperly allowed the Commonwealth's application because it was late and, thus, time barred. The docket (of which we take judicial notice), however, shows that, in fact, the Commonwealth filed a motion to enlarge the

the hearing and that, in any event, the judge erred in ruling that the statements were not voluntary or that the juvenile's mother was not an interested adult. We reverse.

*Standard of review.* Generally, "[i]n reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Bostock*, 450 Mass. 616, 619 (2008), quoting from *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). Here, the judge based his factual findings and legal conclusions on the audio recording of the juvenile's interrogation, and the recording is part of the record on appeal. Thus, we independently will review the recording and make judgments with respect to its content "without deference to the fact finder, who 'is in no better position to evaluate [the] content and significance.' " *Commonwealth* v. *Novo*, 442 Mass. 262, 266 (2004), quoting from *Commonwealth* v. *Bean*, 435 Mass. 708, 714 n.15 (2002). On review, we "are in the same position as the . . . judge" in listening to the audio recording. *Ibid.*, quoting from *Commonwealth* v. *Prater*, 420 Mass. 569, 578 n.7 (1995).

*Facts.* We summarize the evidence presented at the suppression hearing, which is not disputed and which the judge credited in all but one instance, noted *infra*. Sergeant Detective Timothy Horan of the Boston police department testified that on March 28, 2011, he was directed to 35 Darling Street to investigate a break-in in progress. A neighbor had telephoned 911 and reported seeing several suspects trying to pry open the back door of the house at that address. Two police officers arrived in advance of Horan and caught one of the alleged culprits at the scene, John Doe.[3] Upon Horan's arrival he spoke to Doe, who said that he had been with the juvenile and a third individual. Doe said the juvenile had taken a tool from his plumbing class and had used

time to file an interlocutory appeal and that the motion was allowed by the single justice nunc pro tunc to the date filed.

[3] A pseudonym.

it to pry open the door. Doe admitted that the three intended to go inside to see what they could steal. He gave the police the address for each of the two other suspects.

Based on the initial radio dispatch and Doe's statements, Horan believed he had probable cause to arrest the juvenile. Accompanied by two other detectives, Horan went to the juvenile's home and arrested him, transported him to the police station, and contacted his mother. The booking procedure began at about 6:15 P.M. The juvenile's mother arrived at the police station, and the interrogation began soon thereafter at 8:07 P.M.

The interview was conducted by Horan and Detective Phyllis Carter. The judge found that "Horan read each line of the Boston police department Miranda warning juvenile form to the juvenile and asked the juvenile to initial each statement expressing his Miranda rights. After the juvenile signed the Miranda warning form, his mother was asked to initial the form, as well." She did so on the appropriate lines next to the specific Miranda rights and "replied that she had done it before." During the interview the juvenile acknowledged that he had been on probation and that he had been doing community service.[4] Horan also obtained the juvenile's consent to record the interview. The judge found that as "the interview proceeded, the mother began to participate in the process with various statements, remarks, and observations."

Initially, the juvenile did not know what the date was, and the mother remarked, "You should know what today's date is if you stayed in school all day." Horan asked the juvenile to give his account of his "activities this morning up on Darling Street on Mission Hill." The juvenile said, "We was just walking around. And then we just went inside this backyard and we noticed that this door was open, so we went inside the room, went inside the room and see if we can find something. Well, not find anything; we went to see what was in there . . . and when we was leaving, we seen that there was a lot of cops."

---

[4]Despite the implication of this evidence, i.e., that the juvenile had prior experience in the criminal justice system, the judge found that he had none. This discrepancy actually may be a reference to the point made by defense counsel at the suppression hearing, namely that, regardless of evidence of the juvenile's prior involvement in the criminal justice system, there is no evidence of any prior interrogation.

Horan focused on the entry and asked, "Who opened the door?" The juvenile first said that "it was open," and when questioned again, said, "I don't know." When Horan asked if a crowbar was used to break into the house, the mother interjected, "Shit, if I check my car, my crowbar better be in my car. . . . [My car is] outside." The juvenile continued to deny any knowledge of how the door had been opened. Horan explained the situation to the juvenile as follows:

> "[T]hat's not the truth. I know it's not the truth and you know it's not the truth. . . . [H]ere's what's going to happen. I'm going to ask you a bunch of questions. Some of those questions I already know the answer to. Some of them I don't know the answer to. This one I know the answer to; I know how you got in the door. I need you to tell me the truth, because if you don't tell me the truth, we're wasting our time here. This is a chance for you to come clean, [and then] I can speak to the D.A., I can speak to somebody in probation and I can say that you were straight up with me and you were cooperative, and, you know, maybe what you did, . . . a momentary lapse of judgment; you made a mistake, but it's not indicative of who you are as a person. So what I need you to do is to step up and tell the truth. If you keep trying to avoid responsibility, . . . we can't help you. How did you get in the door?"

With a few more prompts from Horan such as, "We did our homework," the juvenile admitted he took a tool from his plumbing class, but continued to deny that he used it or that he was present when the door was opened. The detectives pressed him on the point, telling him that witnesses saw the incident. His mother added, "[P]eople seen . . . . There's witnesses," and the juvenile said, "I didn't open the door, though." She urged him "to tell the truth."

Horan then raised the concept of joint venture, and the juvenile's mother interrupted and asked if she could explain joint venture to the juvenile. She said, "[J]oint venture is what your uncle did thirteen years for; [for] being around someone, not knowing he killed somebody, but he was there. Joint venture. He did twelve years, both of your uncles, thirteen and twelve. You know this." When the juvenile's mother finished, Horan

told him, "This is your chance to tell the truth." Horan again asked the juvenile, "Who opened the door?" The juvenile admitted, "I opened the door."

Horan also explored whether any bicycles were stolen once the juvenile and the two others were inside the house. When the juvenile denied taking a bicycle, his mother told police, "That [one of the other suspects] would have rode his ass on a bike all the way to Mattapan."

The interview turned to questions regarding the juvenile's participation in earlier break-ins. The mother's participation increased during this discussion, including asking the juvenile, "[H]ow many houses have you broken into?" and, "Who lives in Mission Hill?" She told the officers, in regard to jewelry that the juvenile eventually admitted stealing, that "[h]e don't go in [to the pawn shops] . . . . I know that for a fact, because the adult . . . he been around, I know he don't go in there. He can't . . . ."

At some point in the discussion concerning with whom the juvenile was associating, the mother said to the detectives, "Ask him who shot . . . up where I live at now." The judge found that she then "went into a three-minute discussion with the juvenile about the circumstances surrounding an incident at their house where someone started shooting a gun, and her daughter was nearly hit by gunfire. There were nine shell casings found at the scene. The mother and the juvenile went back and forth about who the shooter was, and whose fault the incident was."

The judge also found that after the subject of additional housebreaks was raised, the mother asked the juvenile whether he had ever seen the movie "Get You Sucker" where a man "blew . . . off" a boy's head because he was breaking into houses "and his mother cried?" The mother told the juvenile, "I'm not going to cry." She continued:

> "No, I'm not crying for something negative that you're doing. No, I'm not. No, I'm not. The crowd of friends that you're hanging with, they're going to decease or you're going to decease. You're going to see either jail or you're going to see the light. And right now is the time to see the

light, talk about what's going on right now, talk about where's that and what you're going to do, because my eight year old is downstairs and she got school tomorrow. So you need to hurry up with your conversation. Okay? 'Cuz I'm really getting sick of it. You know what you did, you know how you did it. Let it be known. They know that you done sold stuff downtown. They know that you been downtown selling stuff."

Eventually, the juvenile admitted to at least five other housebreaks.

Horan observed that the juvenile "seemed to be a reasonably intelligent young man," his mother testified that he "does very well in school," and as of the hearing date, he was in the eleventh grade and on track to graduate from high school. The judge found that the juvenile's "intelligence and emotional stability were . . . consistent with an average fifteen year old."

*Discussion.* The judge's allowance of the juvenile's suppression motion rests on two interrelated errors. First, the judge should not have decided the motion on grounds that were not raised or litigated at the suppression hearing. See *Commonwealth v. Rodriguez,* 456 Mass. 578, 588-589 (2010); *Commonwealth v. Mubdi,* 456 Mass. 385, 388-390 (2010). Second, the judge erred in finding that the juvenile's mother was coercive during the interrogation such that the juvenile was not assisted by an interested adult and his statement was involuntary. See *Commonwealth v. Philip S.,* 414 Mass. 804, 809-810 (1993).

1. *Suppression based on ground not raised below.* The Commonwealth argues that the judge erred as a matter of law by considering the mother's conduct during the police interrogation because the juvenile did not raise this issue directly or by implication in his motion to suppress, nor during the suppression hearing. The first mention of the mother's conduct occurred during the Commonwealth's redirect of Horan, when he stated that the mother was urging her son to tell the truth during the interrogation. The only reference made by defense counsel in regard to whether the mother was, in fact, an interested adult occurred during his argument following the end of testimony by the witnesses. The juvenile instead argued below that the evidence failed to demonstrate that he was given an opportunity to consult

privately with an interested adult, and that the police interrogation technique of minimization rendered his statement involuntary. The judge did not reach these issues, but concluded that the juvenile's mother's "domineering" conduct was coercive, rendering the juvenile's statement involuntary and depriving him of the opportunity for meaningful consultation with an interested adult.

Rule 13(a)(2) of the Massachusetts Rules of Criminal Procedure states that all grounds not raised in a defendant's motion to suppress that reasonably could have been known at the time the motion is filed are waived. Mass.R.Crim.P. 13(a)(2), as appearing in 442 Mass. 1516 (2004). In addition, rule 13(a)(2) requires that a signed, fact-based affidavit accompany a motion to suppress, written with a level of detail sufficient to accomplish the practical purposes of (1) enabling a judge to determine whether to conduct an evidentiary hearing; and (2) giving fair notice to the prosecution of the particular search or seizure the defendant is challenging. *Mubdi*, 456 Mass. at 389, citing *Costa* v. *Commonwealth*, 440 Mass. 1003, 1004 (2003).

We recognize that of necessity and in the course of their duties, judges sometimes must identify and narrow issues. *Commonwealth* v. *Campbell*, 83 Mass. App. Ct. 368, 370 n.2 (2013). Nevertheless, "[t]rial judges cannot be expected to rule, and indeed should not, on theories not presented to them, and defendants cannot respond to arguments not made at the trial level." *Commonwealth* v. *Bettencourt*, 447 Mass. 631, 634 (2006). We see no reason that this rule should not also apply to defendants and arguments not made below. Cf. *Commonwealth* v. *Adkinson,* 80 Mass. App. Ct. 570, 588 n.34 (2011) (abuse of discretion to exclude expert testimony without argument on issue from either party or substantive explanation for exclusion). Additionally, a judge ought not to impose his own view of the issue because it may conflict with defense counsel's strategy. *Commonwealth* v. *Hall*, 45 Mass. App. Ct. 146, 157 (1998).

Here, the juvenile claimed that he had been coerced by the police through a minimization technique and that he did not have an opportunity to consult with his mother. Those claims are distinct from a claim that the mother overbore his will such that his statement was involuntary. In such circumstances, fair-

ness and due process dictated that the judge provide both parties notice and an opportunity to be heard on that issue. To suggest otherwise would have required the Commonwealth to litigate all aspects of voluntariness, such as mental impairment, insanity, the influence of alcohol or drugs, trickery or misrepresentation, promises, threats, the physical condition of the defendant, and the failure to inform the defendant that he is a suspect, all of which can be components of coercion. Such a requirement contravenes the clear and more recent holdings of the Supreme Judicial Court that the defendant must state with particularity the basis for his claim, in part, "so that the prosecution may determine which witnesses it should call and what evidence it should offer to meet its burden." *Rodriguez*, 456 Mass. at 588, quoting from *Mubdi*, *supra*. See *Commonwealth* v. *Costa*, 65 Mass. App. Ct. 227, 228 n.1 (2005).

The Commonwealth was not put on notice that it would need to litigate whether the mother was an interested adult or whether she behaved in a coercive manner because the juvenile did not raise these issues and the judge did not seek input from the Commonwealth or the juvenile on the grounds on which he ruled.[5] To suppress the juvenile's statement on this basis, therefore, was error.

2. *Mother's coercion.* In any event, our review convinces us that the record does not support the judge's findings that the juvenile's mother was coercive, that the juvenile was not assisted by an interested adult, and that his statement was involuntary.

a. *Interested adult.* "In general, 'the prosecution has a heavy burden to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination.' " *Commonwealth* v. *Berry*, 410 Mass. 31, 34 (1991), *S.C.*, 420 Mass. 95 (1995), quoting from *Commonwealth* v. *Guyton*, 405 Mass. 497, 500 (1989). In particular, courts must proceed with "special caution" when reviewing purported waivers of constitutional rights "by juveniles, and certain procedures are to be followed in obtaining a juvenile's waiver of his rights against self-

---

[5]The judge did, however, invite counsel to brief *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 432-440 (2004), with regard to the issue of minimization.

incrimination."[6] *Philip S.*, 414 Mass. at 808 (citations omitted). Specifically, in questioning a juvenile who is age fourteen or older, as is the case here, "the police must provide a genuine opportunity for a meaningful consultation with an interested adult prior to obtaining a Miranda waiver." *Commonwealth* v. *Leon L.*, 52 Mass. App. Ct. 823, 826 (2001), citing *Commonwealth* v. *McCra*, 427 Mass. 564, 567 (1998). Viewed from the perspective of the interviewing officers, the adult, objectively, "must have the capacity to appreciate the juvenile's situation and render advice." *Id.* at 826-827. Although the language often used to define the interested adult rule seems to suggest that the rule applies only to the administration and the waiver of the Miranda rights and, thus, is applicable only at the outset of the interrogation, it is clear from the decisional law that the rule extends more broadly and includes consideration whether the juvenile had the assistance of an interested adult throughout the interview. See, e.g., *Philip S., supra* at 810 n.4. To find that a juvenile has not been assisted by an interested adult "it should have been reasonably apparent to the officials . . . that the adult who was present . . . lacked capacity to appreciate the juvenile's situation and to give advice, or was actually antagonistic toward the juvenile." *Id.* at 809.

Here, the "judge did not find that [the mother] lacked capacity to appreciate the situation facing her son or to give him appropriate advice." *Id.* at 810. In fact, the record reflects that the juvenile's mother understood why the juvenile was arrested and why he was being questioned. She appeared concerned about his future and his safety, was present during the entire interview, and was attentive to the administration of the Miranda warnings. See *ibid.* She was engaged throughout the interrogation and participated in the discussion between the interviewing detectives and the juvenile. She even interjected to explain to the

---

[6]The police meticulously advised the juvenile of his Miranda rights in his mother's presence. The judge found and the record reflects that the juvenile signed the Miranda warning form and that he and his mother initialed the line on the form next to each enumerated right, indicating that they understood each right. Defense counsel conceded at the suppression hearing that the juvenile was not challenging that the Miranda rights were read and understood. To the extent that the juvenile revisits this issue on appeal, we conclude there is no merit to the claim and address it briefly, *infra.*

juvenile the concept of joint venture. The audio recording indicates that the mother urged the juvenile to tell the truth and to take responsibility for his actions. The advice was borne from her own difficult life, which included having had two brothers serve long prison sentences, having a nineteen year old son in a gang and serving a jail sentence, and having a daughter almost shot by a rival gang member. Such concern does not render her a disinterested adult. See *ibid.* (mother's distress regarding juvenile's situation did not affect her comprehension of events). Rather, her actions and her statements demonstrated a genuine concern for the juvenile and his future, and their interchanges evinced a strong parent-child relationship. See *Commonwealth* v. *Escalera*, 70 Mass. App. Ct. 729, 731 (2007), and cases cited therein.

Furthermore, throughout the interrogation there was no objective manifestation of animosity between the mother and the juvenile. See *McCra*, 427 Mass. at 569. Therefore, it was reasonable for the detectives to have the objective belief that the mother satisfied the interested adult rule. In fact, the mother attempted toward the end of the interview to provide a defense for the juvenile. Regardless of whether the mother's advice comported with that which a lawyer would have given, it clearly revealed a parent who comprehended the events that had occurred and who could assist her son in the choices he had to make. See *Philip S., supra* (interested adult rule not violated when parent becomes frustrated with juvenile and advises him to "tell the truth," even if lawyer may have given different advice). The judge's determination that the mother was not an interested adult was clearly erroneous.

In addition, contrary to the juvenile's claim below and on appeal, the Commonwealth need not show that an actual consultation with an interested adult occurred, when, as here, he is over the age of fourteen. It long has been clear that a "juvenile defendant over the age of fourteen properly may waive his constitutional rights if, after having been advised of those rights, he was afforded an opportunity to consult with an interested adult who was informed of and understood those rights." *McCra, supra* at 567. The opportunity for consultation "prevent[s] the warnings from becoming merely a ritualistic recitation

wherein the effect of actual comprehension by the juvenile is ignored." *Commonwealth* v. *Alphonso A.*, 438 Mass. 372, 382 (2003), quoting from *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 132 (1983). "It is not necessary for such a juvenile actually to consult with the interested adult, for it is the *opportunity* to consult that is critical." *McCra, supra* at 567-568, quoting from *Berry*, 410 Mass. at 35.

On appeal, the juvenile acknowledges this principle but claims that the opportunity to consult was merely "theoretical." The audio recording plainly reflects Horan discussing each Miranda warning with the juvenile and then confirming with the mother that she also understood each of these rights. At the suppression hearing, the juvenile's mother testified that she had trouble reading, but that a detective "read it for us" and "he explained it." Moreover, it is clear that the juvenile's mother was present and attentive throughout the interrogation and attuned to the situation with which her son was being presented. In these circumstances more was not required.

b. *Voluntariness of statement.* Once a proper Miranda waiver is shown, the Commonwealth then must show that the statement given after waiver was voluntary. *Leon L.*, 52 Mass. App. Ct. at 828. That determination involves examining "the totality of the circumstances surrounding the making of the statements themselves in an effort to determine whether they were the product of a 'rational intellect' and a 'free will.' "[7] *Ibid.*, quoting from *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995). We consider, as part of that due process inquiry, promises or other inducements; the juvenile's age, education, intelligence and emotional stability; the juvenile's experience with the criminal justice system; and the details of the interrogation. *Ibid.*, citing *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001).

Here, the juvenile's mother actively participated during the interrogation, but her conduct did not rise to the level of coercion.

---

[7]The Commonwealth correctly does not dispute that principles governing the voluntariness of a juvenile's statement "apply even though the statements were extracted by private coercion, unalloyed with any official government involvement." *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976).

The audio recording makes clear that the juvenile did not become emotionally upset, suggesting that he did not lose his mental acuity or volition at any point during the interrogation. Contrast *id.* at 829. When the mother did speak during the interrogation, she did not raise her voice at either the juvenile or the detectives. She did not shout or argue with the juvenile. During the early part of the interrogation, the mother's participation related solely to descriptions of the area and time of the alleged break-in, and descriptions of the juvenile's friends. There were lapses during the interrogation when the conversation was solely between the juvenile and the interviewing detectives. Many times, the juvenile ignored the mother's comments and statements. The mother's participation in the later part of the interrogation coincided with her attempts to have the juvenile tell the detectives the truth.

The evidence also reflected that the juvenile was of at least average intelligence for a fifteen year old and on track to graduate from high school, indicating that he had the cognitive ability to make a voluntary statement.[8] This ability was also reflected in his attempt, at times, to manipulate the details of his crimes so as to absolve himself of responsibility. See *Commonwealth* v. *Durand*, 457 Mass. 574, 597-598 & n.30 (2010).

Although there was no evidence the juvenile previously had been interrogated, there was undisputed proof that he had prior experience in the criminal justice system.[9] The mother admitted at the suppression hearing that the juvenile previously had been arraigned in the Suffolk County Division of the Juvenile Court Department in February, 2011. The juvenile also stated during the interrogation that he was currently on probation. In these circumstances, some familiarity with the criminal justice system may be inferred. See *Alfonso A.*, 438 Mass. at 384.

" 'Minimization' is a 'soft-sell' technique in which the police interrogator tries to lull the suspect into a false sense of security by offering sympathy, tolerance, face-saving excuses, and even

---

[8]The judge found that the juvenile was of average intelligence and emotional stability for a fifteen year old, but then concluded that this finding weighed against a conclusion of voluntariness. That a fifteen year old can make a voluntary statement is amply supported in the decisional law. See generally *Commonwealth* v. *Tavares*, 385 Mass. 140, 146, cert. denied, 457 U.S. 1137 (1982) (minor can voluntarily waive constitutional rights and confess).

[9]See note 4, *supra.*

moral justification, by blaming a victim or accomplice, by citing extenuating circumstances, or by playing down the seriousness of the charges." *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 457 n.2 (2004) (Spina, J., dissenting), quoting from Kassin, Police Interrogations and Confessions: Communicating Promises and Threats by Pragmatic Implication, 15 L. & Hum. Behav. 233, 235 (1991). Here, there is no dispute that Horan suggested to the juvenile that he may have had a lapse in judgment during the incident in question and that Horan told him the juvenile that Horan would speak to the authorities on his behalf if he acknowledged his participation in the crime. These statements did not constitute minimization (or a promise of leniency, or trickery or deceit). Contrast *DiGiambattista, supra* at 433-439 (officials significantly exaggerated strength of evidence against defendant while simultaneously minimizing moral and legal gravity of alleged crimes, rendering statement involuntary). And even if the detective's statements could be considered improper minimization, they did not render the juvenile's statement involuntary. See, e.g., *Commonwealth* v. *O'Brian*, 445 Mass. 720, 725, 727-728, cert. denied, 549 U.S. 898 (2006) (detective's statement that "the shooting could have been an accident," even if minimization of the crime, did not render statement involuntary).

Here, the totality of the circumstances does not raise the specter of involuntariness. See, e.g., *Commonwealth* v. *Feeney*, 84 Mass. App. Ct. 124, 133-135 (2013) (police ruse did not render confession involuntary).

> *Order allowing motion to*
> *suppress reversed.*