NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-793                                          Appeals Court

COMMONWEALTH  vs.  DEMETRIUS D.,[1] a juvenile.

No. 17-P-793.

Norfolk.      March 8, 2018. - September 14, 2018.

Present:  Wolohojian, Milkey, & Englander, JJ.

Rape.  Kidnapping.  Indecent Assault and Battery.  Intimidation
    of Witness.  Practice, Criminal, Motion to suppress,
    Required finding, Identification of defendant in courtroom.
    Department of Children & Families.  Privacy.  Search and
    Seizure, Expectation of privacy.  Regulation.  Evidence,
    Fingerprints.

Complaint received and sworn to in the Norfolk County
Division of the Juvenile Court Department on November 11, 2013.

Indictments found and returned in the Norfolk County
Division of the Juvenile Court Department on January 6, 2014.

A pretrial motion to suppress evidence was heard by Mary M.
McCallum, J., and the cases were tried before her.

Elizabeth Caddick for the juvenile.

---

[1] A pseudonym.

Marguerite T. Grant, Assistant District Attorney, for the Commonwealth.

WOLOHOJIAN, J.  The juvenile was convicted, as a youthful offender (G. L. c. 119, § 54), on two indictments for aggravated rape of a child with force (G. L. c. 265, § 22B [a]), and one indictment each for kidnapping (G. L. c. 265, § 26), indecent assault and battery on a child under fourteen (G. L. c. 265, § 13B), intimidation of a witness (G. L. c. 268, § 13B), and assault and battery by means of a dangerous weapon, to wit, a shod foot (G. L. c. 265, § 15A [b]),[2] all arising from his attack on an eleven year old boy.  At the time of the incident, the juvenile was in the custody of the Department of Children and Families (department) and living in foster care.  He now appeals, raising several arguments.

First, the juvenile argues that evidence seized from his bedroom at a foster home where he had been placed should have been suppressed because the department should not have disclosed his address to the police.  Second, he argues that defense counsel should have been allowed to comment to the jury about the absence of any identification, even though the exclusion of in-court identifications was the result of his successful opposition to the Commonwealth's motion in limine to permit

---

[2] He was also found delinquent on one charge of assault and battery (G. L. c. 265, § 13A [a]).

certain witnesses to make such identifications, and there had been no out-of-court identifications. He also challenges the sufficiency of the evidence on the charge of kidnapping and the admission of expert fingerprint testimony. We affirm.

Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found the following. On October 31, 2013, the juvenile was fifteen years old, approximately five feet, three inches tall, on the thin side, and had "brownish" hair and a light brown complexion. He lived with a foster family in a town south of Boston. So that the juvenile could participate in Halloween, employees of the department had bought him a costume consisting of a black vest with the word "SWAT" written on it in white lettering, a black SWAT or military-type hat, and a black "North Face" brand jacket. Wearing this costume, a pair of black "Air Jordan" sneakers, and carrying a black "Michael Jordan" backpack, the juvenile left his foster home to go trick-or-treating.

At the same time, eleven year old Jason[3] was trick-or-treating nearby with four female schoolmates. When they were near the local high school, they were approached by the juvenile, who asked if he could join them. None of them knew

---

[3] A pseudonym.

the juvenile,[4] who said his name was "Devon" or "Deron."  Jason felt sorry that the juvenile was all alone and agreed to let him join the group.  Shortly thereafter, however, the girls, who were scared and uncomfortable being in the company of the juvenile, decided to break off on their own.  They urged Jason to come with them, but he declined because he did not want to leave the juvenile by himself.  Jason and the juvenile, therefore, continued trick-or-treating on their own for approximately the next two hours.[5]  At some point during the evening, the juvenile told Jason that he was going to move to a different town.

Each boy carried a drink:  the juvenile, a can of "Monster" energy drink; Jason, a bottle of "Brisk" iced tea.  At one point, while on a side street, the juvenile left his drink in the middle of the road.  The can, which was later recovered, bore a latent fingerprint that matched the juvenile's right thumb.  After some time, the two boys turned down another side street, a short cul-de-sac.  The street was not well lit and,

---

[4] Later that evening, the children provided police with descriptions of the juvenile's physical appearance, clothing, and costume that, along with other evidence, were sufficient to establish beyond a reasonable doubt that the boy who approached them near the high school was the juvenile.

[5] En route, the juvenile and Jason stopped at the house of one of the four girls.  The girl's mother provided police with a description of the stranger accompanying Jason that matched the juvenile.

while it was lined with houses, there was no one about. As they neared the dead end, the juvenile abruptly grabbed Jason's bag of candy and started to walk away. Jason, unsure of the juvenile's intentions, began to cry. At that, the juvenile turned around, came back, and returned the bag. However, he then placed Jason in a choke hold and punched his head and face, causing Jason's nose to bleed. The juvenile then pushed Jason to the ground, kicked him in the head and body, and then instructed Jason to strip. Jason, having unsuccessfully tried to escape and in fear for his life, did as he was directed. The juvenile then pulled down the front of his own pants and forced Jason to perform fellatio. He then told Jason to bend over, and proceeded to anally penetrate the younger boy with his penis. Eventually, the juvenile stopped; he then resumed kicking Jason while threatening to kill Jason's family if he told anyone what had occurred. The juvenile instructed Jason to stay on the ground and not to move or else he would return to beat him again. He urinated on Jason and then doused him with his (Jason's) iced tea. Finally, the juvenile walked away, leaving Jason lying in the street.

Jason remained in the street, afraid to move lest the juvenile make good on his threat to return. From that position, Jason called 911 twice (the first call was disconnected). Although the recordings of those calls show Jason to be filled

with fear, he nonetheless managed to provide a good description of his assailant (i.e., dressed all in black and wearing a SWAT vest and a black hat as a costume) as well as many of the details of the attack.  When police arrived, Jason's costume, clothes, sneakers, candy, and iced tea bottle were strewn about, and the area smelled of urine.[6]  There was also a blood stain on the pavement.  Jason himself smelled of urine and had visible injuries to his nose, upper lip, cheeks, head, wrist, and elbow.

After interviewing Jason and the four girls, the police released a dispatch looking for a "[l]ight skin, Cape Verdean, black or Hispanic male, thin, light-colored hair, between 5' 3" and 5' 5" in height, wearing a SWAT costume, a SWAT vest with the letters 'SWAT' in white lettering across the front, black or dark-colored pants, dark-colored sneakers, and also a black Michael Jordan backpack."  No one matching the description was located that night.  The following afternoon, however, two clerks at a nearby convenience store stated that they had earlier that day observed a boy at a house across the street, carrying bags and other items out of the house and placing them in a car, as if in the process of moving.  One of the items was

---

[6] Although samples of blood, seminal fluid, and urine were recovered and tested, none were conclusively tied to the juvenile.

a black vest with the word "SWAT" written on it.  The house belonged to the juvenile's foster family.

From the foster father, the police learned that the boy they were looking for was the juvenile and that he was in the custody of the department.  They also learned that, earlier that afternoon, the department had moved the juvenile to a new foster home in another town.  The foster father knew the name of the town, but not the street address.  The police, therefore, contacted the department, which disclosed the address to them.

At the second foster home, the juvenile's new foster father confirmed that the juvenile had moved in and that he had placed his belongings in a bedroom.  After inviting the police into the home, the foster father led them to the bedroom, where they observed several bags, a black Michael Jordan backpack, and a black vest with the word "SWAT" in white lettering across the front.  The police seized these items, and subsequently obtained a warrant to search them.  In the bags, they found a pair of black "Air Jordan" sneakers, a black "North Face" brand jacket, and a black SWAT or military-type hat.  The backpack was full of Halloween candy.

Discussion.  1.  Motion to suppress.  The juvenile argues that the items seized from his bedroom at the second foster home should have been suppressed because the seizure resulted from the department's disclosure of his address, which he contends

the department was required to hold confidential.[7]  Specifically, he maintains that, under 110 Code Mass. Regs. §§ 12.00 (2008) and related statutes, his address, to the extent that it was in the possession of the department, was confidential and could not be disclosed to the police as it was here.  Although we set out below the details of the statutory and regulatory framework upon which he relies, we conclude it did not require application of the exclusionary rule.

"Access to . . . Department[] records is governed by several sources of law."  110 Code Mass. Regs. § 12.02.[8]  While the juvenile generally refers to several of those sources, his argument centers on G. L. c. 119, § 51F, which requires that the department maintain a "central registry of information" sufficient to identify children who have been reported to it because they are believed to be victims of abuse or neglect,[9] and further provides:

---

[7] On appeal, the juvenile does not press several other arguments he raised below in support of his motion to suppress.

[8] The statutes cited in 110 Code Mass. Regs. § 12.02 include G. L. c. 4, § 7, Twenty-sixth; G. L. c. 30, § 42; G. L. c. 66; G. L. c. 66A; G. L. c. 112, § 135; G. L. c. 119, §§ 51E and 51F; and G. L. c. 210, §§ 5C and 5D.

[9] The department's primary duty is to protect children from abuse or neglect by their "caretaker[s]."  110 Code Mass. Regs. § 4.21 (commentary) (2009).  See 110 Code Mass. Regs. § 2.00 (2008) (defining "caretaker," "abuse," and "neglect").  The criminal justice system has primary responsibility for

> "Data and information relating to individual cases in the central registry shall be confidential and shall be made available only with the approval of the commissioner or upon court order; provided, however, that the department, upon request, may release this data and information to a child welfare agency of another state for the purpose of assisting that agency in determining whether to approve a prospective foster or adoptive parent.  The commissioner shall establish rules and regulations governing the availability of such data and information."

G. L. c. 119, § 51F.[10]

To fulfil this mandate, the department promulgated 110 Code Mass. Regs. §§ 12.00 et seq., which, according to its stated purpose, "enumerates the rules for access to information kept in the [central registry . . . and] sets forth rules for access to other Department files or information."  110 Code Mass. Regs. § 12.01.  The regulation provides that the central registry "shall contain, but need not be limited to, all identifying data that is known ('identifying data' shall mean name, date of

---

investigating acts of "child abuse" committed by noncaretakers. 110 Code Mass. Regs. § 4.21 (commentary).

[10] Title 110 Code Mass. Regs. § 4.35 identifies specific parties who may have access to the central registry and for what purpose.  It further provides:

> "No other individual, group, agency or department, including law enforcement . . . may have access to the Central Registry without the written approval of the Commissioner, an order of a court of competent jurisdiction, or as authorized by . . . G. L. c. 119, § 51F" (emphasis added).

110 Code Mass. Regs. § 4.35(4) (2009).

birth, sex, ethnicity, and address) for each child who is the subject of a report pursuant to . . . G. L. c. 119, § 51A" (emphasis added). 110 Code Mass. Regs. § 12.03. From this, the juvenile argues that his address amounted to confidential "identifying data" that could only be released if, and as, permitted by the rules set forth in the regulation.

The regulation provides for the release of information by the department under certain specific circumstances. See, e.g., 110 Code Mass. Regs. § 12.06 (to "providers"), § 12.07 (in response to compulsory legal process in a civil proceeding), § 12.09 (in litigation in which either the department or one of its contracting providers is a party), § 12.10 (to the person the records are about or the child's parents), § 12.14 (to the bureau of special investigations), and § 12.15 (to the department of youth services). None of those circumstances involves a criminal investigation or proceeding, particularly, as the juvenile notes, one where a child in the department's custody is a possible or known suspect. The juvenile relies on this omission to argue that the department is not free to release identifying data under those circumstances absent either a court order, as referenced in G. L. c. 119, § 51F,[11] or consent

_____

[11] While the juvenile dismisses the option in this case, G. L. c. 119, § 51F, also provides for the release of data and information in the central registry "with the approval of the commissioner."

by a guardian ad litem appointed to represent the interests of the child, as is suggested in a separate regulation governing requests from a police officer or representative of a district attorney's office to interview a child in the department's custody who is a "possible or known defendant in a criminal action."  110 Code Mass. Regs. § 4.34(1)(a) (2009).

The Commonwealth for its part argues that the department's release of the juvenile's address was not only authorized, but required under G. L. c. 119, § 51B (k), and 110 Code Mass. Regs. §§ 4.50-4.51 (2009).  That statute and related regulations address when and how the department is required to refer a matter to a district attorney and local law enforcement.[12]  A referral is "[m]andatory" when the department receives a report of abuse or neglect of a child, see 110 Code Mass. Regs. § 4.51 (2009), and, after investigation or based on "early evidence," see G. L. c. 119, § 51B (k), has reasonable cause to believe that certain enumerated conditions have resulted from the abuse

---

[12] In 110 Code Mass. Regs. § 12.07, there is a cross reference to § 4.53 "for criminal proceedings."  Title 110 Code Mass. Regs. § 4.53 (2009) details the procedures the department must follow after it has made a "mandatory" or "discretionary" referral to a district attorney or local law enforcement, as required under G. L. c. 119, § 51B (k), and 110 Code Mass. Regs. §§ 4.50-4.52, as well as when documents from department files are subpoenaed in a criminal matter to which the department is not a party.

or neglect. Those conditions include where "a child has been sexually assaulted" or there is "any other disclosure of physical abuse involving physical evidence which may be destroyed." G. L. c. 119, § 51B (k) (2); § 51B (k) (4); 110 Code Mass. Regs. § 4.51(2)(b) and (2)(e)(3) (2009). According to the Commonwealth, the police made a report of abuse of a child, namely, Jason, when they called the department on November 1, 2013, seeking the juvenile's address. Since the reported abuse resulted in sexual assault or physical abuse involving evidence that was in danger of being destroyed, the department was required to release the juvenile's address.[13]

We suppress evidence resulting from the government's violation of a statute only where the statute is both "closely associated with constitutional rights, rights grounded in fundamental fairness," Commonwealth v. LeBlanc, 407 Mass. 70, 75 (1990), quoting Commonwealth v. Lyons, 397 Mass. 644, 647 (1986), and where "an exclusionary rule [is] inherent in the purpose of [the] statute."[14] Commonwealth v. LeBlanc, supra.

---

[13] The record does not disclose what the police said during the call to the department on November 1, 2013.

[14] The juvenile also argues that the disclosure violated constitutional and statutory rights to privacy. Having failed to raise those arguments in connection with the motion to suppress below, however, they are waived. See Commonwealth v. Quint Q., 84 Mass. App. Ct. 507, 514 (2013).

See generally <u>Commonwealth</u> v. <u>Upton</u>, 394 Mass. 363, 367 n.4 (1985), and cases collected therein. We do not see the statutory scheme at issue here to be of this sort. To begin with, we note that the juvenile has not identified, nor do we know of, any constitutionally based interest in keeping his address confidential. Thus, whatever confidentiality the statute may provide to children within the department's purview, that protection cannot be said to be "closely associated" with a constitutional right. The juvenile has not cited, nor have we found, any authority for the proposition that either the Fourteenth Amendment to the United States Constitution or arts. 12 and 14 of the Massachusetts Declaration of Rights restrict police authority to locate a criminal suspect by asking knowledgeable people for his address or whereabouts.

Nor are we persuaded that an exclusionary rule is inherent in the purpose of the statute. To the contrary, the statute provides its own remedy, see G. L. c. 119, § 51F,[15] and therefore

---

[15] General Laws c. 119, § 51F, provides, in pertinent part:

> "Any person employed in the central registry who permits the data and information stored in the registry to be released without authorization to persons other than those specified in the rules and regulations shall be punished by a fine of not more than $1,000 or by imprisonment for not more than 2 1/2 years, or both."

General Laws c. 119, § 51E, which provides for the confidentiality of written reports prepared by the department under §§ 51A-51D, also provides a penalty for a violation.

there is no need to graft an exclusionary rule to it "to make the statute an effective piece of legislation." Commonwealth v. Jones, 362 Mass. 497, 502 (1972). Compare id. at 503 (suppressing evidence of identification made at police station after defendant was intentionally denied his statutory right to use telephone); Commonwealth v. Alicea, 428 Mass. 711, 716 (1999) ("To make the statute an effective piece of legislation in the absence of [a prescribed penalty for a violation], we have grafted an exclusionary rule to it" [quotation omitted]).

We note further that our view of the statute is consistent with the purpose of the exclusionary rule, which is "to deter police misconduct and preserve judicial integrity by dissociating courts from unlawful conduct." Commonwealth v. Nelson, 460 Mass. 564, 571 (2011). There was no police misconduct here. Instead, good police work and investigation led the police to the juvenile, confirmed many details of the attack and his role as its perpetrator, established his possession of the identifying costume, and led them to the town to which he had moved and taken that important evidence. In these circumstances, the police cannot be said to have done anything wrong when they contacted the department to learn the

address of the juvenile's new foster home -- information that, as we noted above, does not enjoy constitutional protection.

2. <u>Identification issues</u>. Two months before trial, the Commonwealth moved in limine, pursuant to <u>Commonwealth</u> v. <u>Crayton</u>, 470 Mass. 228 (2014), for leave to have Jason and the four girls attempt to identify the juvenile in court. <u>Crayton</u> was not decided until approximately one year after the crimes at issue, and none of these witnesses had been asked to identify the juvenile out of court. The juvenile opposed the motion, and the trial judge denied it, concluding, based on <u>Crayton</u>, that the in-court identifications would be "inherently suggestive" and that there was not "good reason" for allowing them. The juvenile argues that the judge subsequently erred when, at the request of the Commonwealth, she precluded the juvenile from mentioning the absence of in-court identifications to the jury. We disagree.

It is established that "[c]ounsel may not, in closing, exploit the absence of evidence that had been excluded at his request. . . . Such exploitation of absent, excluded evidence is fundamentally unfair and reprehensible" (quotations and citation omitted). <u>Commonwealth</u> v. <u>Harris</u>, 443 Mass. 714, 732 (2005). See Mass. G. Evid. § 1113(b)(3)(A) (2018). The juvenile argues, however, that this general proposition does not apply because he did not affirmatively move to exclude the

evidence, but only opposed the Commonwealth's motion to introduce it. This, we think, is a distinction without a difference where, as here, the Supreme Judicial Court has deliberately placed on the Commonwealth the burden to move to admit in-court identifications where there has been no out-of-court identification, rather than saddling defendants with the burden of moving to exclude them, while leaving the burden of showing undue suggestiveness on the defendant.[16] Commonwealth v. Crayton, 470 Mass. at 243. If a defendant meets that burden then he "prevail[s] in suppressing the in-court identification

---

[16] In Crayton, the court stated:

"Although we generally place the burden on the defendant to move to suppress an identification, that makes little sense where there is no out-of-court identification of the defendant by a witness and only the prosecutor knows whether he or she intends to elicit an in-court identification from the witness. If the burden were on the defendant to move to suppress an identification in these circumstances, a defendant would need to file motions to suppress the in-court identification of witnesses whom the prosecutor might not intend to ask to make such an identification. To avoid the filing of needless motions, we place the burden on the prosecutor to move in limine to admit the in-court identification of the defendant by a witness where there has been no out-of-court identification."

470 Mass. at 243. The court continued, "Once the motion is filed, the defendant would continue to bear the burden of showing that the in-court identification would be unnecessarily suggestive and that there is not 'good reason' for it." Id.

as unnecessarily suggestive," id. -- the same outcome as had he been the initial movant.

The juvenile also argues that the judge erred in precluding him from making a "Bowden argument" with respect to the lack of out-of-court identification. Commonwealth v. Bowden, 379 Mass. 472 (1980). Even were we to accept the juvenile's contention that he raised and preserved this issue during the charge conference (despite the fact that the juvenile did not mention Bowden to the judge), we discern no error. To begin, the evidentiary predicate for such an argument did not exist; despite the fact that the juvenile was never prevented from questioning witnesses, including the police, about the lack of out-of-court identification procedures, he did not do so. And this sensible strategic decision was no doubt the result of counsel's successful opposition to the Commonwealth's motion in limine.[17]

3. Kidnapping. The juvenile next argues that his conviction of kidnapping cannot stand because the evidence, even when viewed in the light most favorable to the Commonwealth, was insufficient to establish beyond a reasonable doubt the element

_____

[17] The juvenile requested a Bowden instruction, but only for purposes of arguing to the jury about "testing of materials of certain biologicals" and the Commonwealth's failure to test the iced tea bottle for fingerprints. The trial judge declined to give the instruction, but permitted counsel to argue those alleged investigative deficiencies to the jury.

of "secret confinement." In particular, he notes that the incident took place on a public street, in the vicinity of several residential houses, and that Jason was left with his cellular telephone. "Within the context of the crime of kidnapping, the concept of 'confinement' has been broadly interpreted to mean any restraint of a person's movement," Commonwealth v. Lent, 46 Mass. App. Ct. 705, 710 (1999), and can be either secret or forcible. See G. L. c. 265, § 26. The evidence clearly permitted such a finding here. Compare Commonwealth v. Brown, 66 Mass. App. Ct. 237, 242 (2006) (confinement established where defendant threw victim to the ground under a bridge and forcefully removed her clothing, threatened to kill her if she told anyone what he had done, constrained her movements by poking her with a sharp stick, "told her she could not leave, and she remained because he had scared her and she was too frightened to attempt to leave").

4. Fingerprint testimony. Finally, the juvenile argues that the examiner from the State police crime lab who testified to matching the latent fingerprint found on the can of Monster energy drink to the known print of the juvenile's right thumb, did so with overstated certainty and improperly bolstered his testimony by noting that, in accordance with the lab's protocol, his findings had been verified by two other examiners who were not present in court and therefore could not be subject to

cross-examination.  The juvenile did not object or move to strike any of this testimony, so we review for a substantial risk of a miscarriage of justice.  See Commonwealth v. McCoy, 456 Mass. 838, 845-846 (2010).  See also Commonwealth v. Grady, 474 Mass. 715, 721-722 (2016).  We discern none here because trial counsel elicited on cross-examination that the examiner's view was only his opinion, based on personal observations, that the two fingerprints matched.  As such, it is unlikely that the jury took the fingerprint match to be established as a matter of certainty.  As for the testimony regarding the verifying opinions of the other two examiners, that testimony was invited by trial counsel in his cross-examination of the examiner.  And, while the fingerprint evidence was meaningful, it was only one small piece of the wealth of evidence tying the juvenile to the crime.

Judgments affirmed.

Adjudication of delinquency
  by reason of assault and
  battery affirmed.